**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| Plaintiff | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **THE UNIVERSITY OF CHICAGO,** | ) | |
| and **JANE ROE**, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

Plaintiff, John Doe[1] ("Plaintiff" or "John Doe"), by and through his attorneys Crotty & Schiltz, LLC, complains of Defendant University of Chicago ("UC") and Defendant Jane Roe ("Jane Roe") as follows:

### BRIEF SUMMARY OF THIS ACTION

1.      On June 5, 2018, four days before he was scheduled to graduate with honors, UC expelled Plaintiff in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§1681, *et seq.*, ("Title IX").

2.       The purported bases for UC's decision to expel Plaintiff were the false and defamatory allegations of his ex-girlfriend, Defendant Jane Roe.

3.      UC expelled Plaintiff despite overwhelming evidence that Jane Roe fabricated her story because she was too embarrassed to admit to her friends at UC that she was engaged in a secret sexual relationship with her ex-boyfriend. This evidence included:

---

[1] Contemporaneously with the filing of the Complaint, Plaintiff filed a motion to proceed under pseudonyms for himself and Defendant Jane Roe.

a.   Jane Roe's admission that she was engaged in a consensual sexual relationship with Plaintiff;

b.   Jane Roe's admission that she was lying to her UC friends about her consensual sexual relationship for fear that they would be mad that she had re-kindled a relationship with her ex-boyfriend;

c.   Jane Roe's recent text messages to a non-UC friend stating: (i) that she "hooked up" with Plaintiff again, (ii) "but like we can't tell anyone" because "we both said shit to our friends and they'd be pissed if they knew we went back to each other in any capacity," (iii) sex with Plaintiff was "good," and (iv) that "I just might use him for sex when I want it and have no emotional connection";

d.   Jane Roe's testimony that during this time, "I was just letting him buy me food and was having sex with him, to satisfy my own desires, as I knew he would be willing";

e.   Jane Roe's testimony that after she had sex, she told Plaintiff "well, I got what I wanted" and left; and

f.   The statement of "CG", a friend of Jane Roe, that Jane Roe facetimed her from Plaintiff's bedroom on the night in question for almost a full hour, that Plaintiff and CG were wearing minimal clothing, everything was normal and seemed consensual and, at the end of the call, Jane Roe stated that she and Plaintiff were going to go "angry fuck."

4.     UC disregarded this and all other exculpatory evidence supporting Plaintiff's vehement denials of wrongful conduct and accepted Jane Roe's unsupported accusations for no reason other than the fact that Plaintiff is male and Jane Roe is female.

5.     As a result of Jane Roe's false and defamatory allegations and UC's discriminatory conduct, John Doe's life has been shattered. He lost the college degree and job he earned. His future economic opportunities have been crippled. His reputation has been destroyed, having been brandished a rapist. And, he suffers from extreme depression, anxiety, emotional distress and suicidal ideation from the stress and humiliation inflicted on him.

## PARTIES

6.     Plaintiff John Doe is a 22-year old male, and a citizen of the State of Florida.

7.     In the spring of 2018, Plaintiff was a student in good standing at UC, finishing his final semester of studies. He had successfully completed his final exams and was scheduled to graduate on June 9, 2018, with honors and receive his Bachelor of Arts degree in Public Policy with a specialization in Finance.

8.      Defendant UC is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois.

9.     Defendant Jane Roe is a citizen of the State of North Carolina. She is currently enrolled at UC and living in Chicago, Illinois.

## JURISDICTION AND VENUE

10.    This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, and Illinois common law.

11.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

12.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332 as this matter involves complete diversity of citizenship between Plaintiff and the defendants, who are citizens of different states, and the amount in controversy exceeds $75,000.

13.     This Court has supplemental jurisdiction over Plaintiff's state court claims pursuant to 28 U.S.C. §1367.

14.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## FACTS

### THE RELATIONSHIP BETWEEN PLAINTIFF AND JANE ROE

15.     In the Autumn Quarter 2017, Plaintiff was in his senior year at UC.

16.     Plaintiff was an exemplary student, on track to earn his B.A. degree in June 2018. As a result of his academic excellence and successful summer work history, Plaintiff obtained an offer of employment with a global supply chain consulting firm, contingent upon his successful completion of his studies at UC.

17.     Plaintiff first met defendant Jane Roe at a mixer in October of 2017. The next week, they saw each other again at a fraternity "bar night." That night, Plaintiff and Jane Roe went back to Plaintiff's apartment and spent the night.

18.     Every night for the rest of that week, Jane Roe slept at Plaintiff's apartment and they engaged in consensual sexual activity. Within that first week, Plaintiff and Jane Roe agreed to be "exclusive" and tell people they were "dating." Within two weeks of dating, Plaintiff and Jane Roe were saying "I love you" to each other.

19.     Almost every night for the remainder of the Autumn Quarter, Jane Roe slept in Plaintiff's bed at Plaintiff's apartment.  Most nights, and often times during the day, Plaintiff and Jane Roe engaged in consensual sexual activity.

20.     As Jane Roe later stated, "I was essentially living in [Plaintiff's] apartment" during the Autumn Quarter. Plaintiff's roommates even asked Jane Roe to contribute to the utilities since she was there so often; Jane Roe conceded that they had a "valid point."

21.     Plaintiff and Jane Roe had a joking and playful relationship. As Jane Roe explained: she "would lightly hit" Plaintiff with a "playful punch;" she would jump out from behind doors and try to scare him; she hit Plaintiff's spoon when he was eating; and Plaintiff splattered shaving cream on her face, which she thought was "really funny."

22.     As Jane Roe later wrote: "For the most part, we had a good relationship – he was nice to me, we enjoyed each others company, and I was happy."

**PLAINTIFF AND JANE ROE GO TO COSTA RICA**

23.     For winter break, Jane Roe invited Plaintiff to accompany her and her family on a vacation trip to Costa Rica. Toward the end of the trip, Plaintiff and Jane Roe started to get on each other's nerves and argue about inconsequential matters.

24.     On New Year's Eve, while Jane Roe was in the shower, Plaintiff put shaving cream on her back in much the same manner as the previous practical joke that she had found "really funny."

25.     Jane Roe reacted to Plaintiff's attempt to break the tension between them in this manner by punching him squarely in the face leaving visible facial bruising.

26.     Plaintiff picked up Jane Roe's vaping juul and left the bathroom. Jane Roe got out of the shower, and confronted Plaintiff, who said that he would give her the juul if she would apologize for punching him. Jane Roe responded by grabbing Plaintiff's arm and digging her nails into it to the point of drawing blood.

27. Plaintiff reacted by telling Jane Roe that he was breaking up with her and spitting at her. At the suggestion of Jane Roe's mother, Plaintiff and Jane Roe stayed away from one another for the final day of the trip.

28. When she arrived back at UC, Jane Roe told her friends about the incident in Costa Rica, stressing the spitting incident but not her own conduct. In her words, Jane Roe talked "shit" about Plaintiff to the point that her friends would not have supported her "having any kind of relationship post breakup."

**PLAINTIFF AND JANE ROE RENEW THEIR CONSENSUAL SEXUAL RELATIONSHIP**

29. A few weeks into Winter Quarter 2018, Plaintiff and Jane Roe saw each other at another bar night. After each accused the other of "talking shit" around campus, they talked further and, as Jane Roe described it: "I ended up going home with him. We had sex that night, which was fine and consensual."

30. Over the next couple of weeks, Plaintiff and Jane Roe met a number of times and engaged in consensual sexual activities.

31. Initially, Plaintiff believed that he and Jane Roe would be renewing their dating relationship, but Jane Roe informed him that she was only interested in a sexual relationship. Indeed, as Jane Roe admits, one night she went over to Plaintiff's apartment to have sex with him and, when they finished, she told him "well, I got what I wanted" and left.

32. During Winter Quarter, Jane Roe was very worried that her friends would discover—and not approve of – the fact that she had renewed her sexual relationship with the Plaintiff. This concern is illustrated in a January 25, 2018 text exchange she had with a friend from back home:

      ROE:  I fucked up last night
                 Hooked up with my ex

KH:    WHAT
OMG tell me all about ot

ROE:   People had been telling me that he was talking shit about me so I confronted him
a this party we were both at and we ended up just talked for a while about how we
didn't want animosity and ended up going home and talking more and hooked up
But I was like this isn't going to be a thing again and then left

KH:    omgggggggggggg
I bet he thought he gotcha back
Im shook was the sex good at least

ROE:   Yeah it was
But like we can't tell anyone

KH:    Well that's good
Yeah true

ROE:   We both talked shit to our friends and they'd all be pissed if they knew we went
back to each other in any capacity
So now idk where to go from here
I might just use him for sex when I want it and have no emotional connection

KH:    wym like do you think you still have feelings for him
Yeah that sounds right

ROE:   No I don't

33.    Two days later, Jane Roe slept over at Plaintiff's apartment again and, according to Jane Roe: "I did sleep in his bed, and we did have consensual sex."

34.    The next day, Jane Roe's friend (KH) texted her to ask where she slept the night before. Jane Roe lied, telling her friend that she had slept on Plaintiff's couch when in fact she had slept in his bed and had consensual sex with him.

35.    KH nonetheless scolded Jane Roe for even being in contact with Plaintiff:

KH:    And I don't understand why u are still in contact with him

ROE:   I don't talk to him I literally just slept there
And on the couch not his bed
       *      *      *      *

Like I don't want you to feel hurt or betrayed or anything but like I promise you that I'm not going back to him ever
\*       \*       \*       \*
He's not my go to it's always you
It was just a weird situation
I love you
Thanks for looking out for me I appreciate it

KH:     [Jane] I really don't want u to go back to him or even be friends with him and if u do its really going to hurt me
Because things went back to normal and I'm closer to you than I ever was
And I don't want you to be ruined again.

ROE:     I know and I promise you that is not going to happen
I see how bad everything was and trust me I don't want that back at all
If there was ever a choice between you and him I would choose you every single time

KH:     Okay I trust you on that please don't disappoint me you deserve so much better than him
And everyone thinks so

ROE:     I know

KH:     I just don't want to lose u and I love u and I don't want u to be hurt

ROE:     I know and Im so glad youre looking out for me
but again like always you over him

KH:     Love you

ROE:     love you tons

36.     Jane Roe later admitted that "What I said in these messages is not the truth, and I just didn't want my friends to know what was going on."

37.     In fact, Jane Roe went over to Plaintiff's apartment that very night, admitting that "if we did have sex that night, it would have been consensual."

38.     Jane Roe changed Plaintiff's name in her cell phone so her friends would not know if she was talking to or texting with him. She would also turn off the location service on

her phone when she went to Plaintiff's apartment, so her friends would not know she was seeing him.

39.     Plaintiff and Jane Roe continued this consensual sexual relationship for several weeks. As she admits, "I was just letting him buy me food and was having sex with him, to satisfy my own desires, as I knew he would be willing."

40.     Although Jane Roe cannot remember every occasion on which she had sex with Plaintiff during Winter Quarter, she testified that with one exception (discussed below) "I will say once again that each time we had sex post-relationship was consensual."

**PLAINTIFF AND JANE ROE ENGAGE IN CONSENSUAL SEX ON MARCH 9, 2018**

41.     On March 9, 2018, Plaintiff attended his fraternity formal with CG, a mutual friend of his and Jane Roe. At about 11:45 p.m., after the formal, Plaintiff and CG went to a party. Jane Roe was at the party and the three of them hung out together.

42.     Plaintiff drank a lot that night. "KC," a female friend of CG who was at the party, says she saw Plaintiff drink a bottle of wine with two other people, shotgun three beers, drink a half a solo cup of whiskey and possibly drink more. Regarding Jane Roe, KC said that she "has seen [Jane Roe] drunk worse than she was that night." According to KC, Plaintiff and Jane Roe "were very cordial to one another and on good terms for being ex's. They both equally seemed to want to spend the night together that night."

43.     "LP," a first-year student at UC and a friend of Jane Roe, was at the party. From his interactions with Jane Roe, he opined that she "was reasonably drunk. She was perfectly functional, not slurring words, but it was clear she had a bit to drink."

44.     Plaintiff left the party and went to his apartment.  At 1:15 a.m., he texted Jane Roe, inviting her to come to his apartment. Jane Roe went to the apartment shortly thereafter.

45. Plaintiff's roommate, "FG," was at the apartment that night. He described Jane Roe as "smiling and happy" and stated that, while everyone at the apartment had been drinking, "everyone was under control, just slightly under the influence."

46. Jane Roe posted a number of Snapchat videos from Plaintiff's living room and, after spending a brief time with Plaintiff's roommate and one of his friends, Plaintiff and Jane Roe went to Plaintiff's bedroom to have sex.

47. Plaintiff and Jane Roe were making out in Plaintiff's bed but Plaintiff was still too inebriated to obtain an erection, despite Jane Roe's efforts to manually stimulate him. The two of them kissed and talked for an extended period.

48. During this conversation, Jane Roe stated that she was only there to "hate fuck" Plaintiff and he said the same back to her. As Plaintiff still could not achieve an erection, he went to the bathroom and ingested some ExtenZe pills. When he returned to his bed, Jane Roe was facetiming with CG.

49. CG stated that Jane Roe facetimed her from Plaintiff's bed at around 3 a.m. Plaintiff and Jane Roe were wearing minimal clothing and the three of them talked for about an hour. CG said that "by all appearances, everything seemed consensual." Jane Roe "was able to participate fully and communicated clearly in the conversation." Jane Roe "was not incapacitated." After an hour, Jane Roe told CG that it was time for her to go and "angry fuck" with the Plaintiff.

50. Sometime after 4 a.m., Jane Roe told Plaintiff that if he was unable to have sex she was going to go home. Plaintiff stated that enough time had passed and he was "ready."

51.     Plaintiff and Jane Roe started kissing and making out again. At one point, Jane Roe reached inside Plaintiff's underwear and manually stimulated him to an erection. Plaintiff and Jane Roe engaged in consensual sexual intercourse and other consensual sex acts.

52.     When they finished, Plaintiff invited Jane Roe to stay the night. As had been her practice in the Winter Quarter, she said she would rather go home. By this time, the sun was coming up and it had been at least 5 hours since Jane Roe had consumed any alcohol.

53.     The next day, Jane Roe had to deal with the fact that – because she had posted Snapchat videos from Plaintiff's apartment – her friends would know that she had been there and would assume that she and the Plaintiff had had sex. Rather than admit to her friends that she had gone over to Plaintiff's apartment for emotionless sex as she had done a number of other times that quarter, Jane Roe lied. She told her friends that she was too drunk to remember how she got to Plaintiff's apartment or what had happened once she was there.

54.     Jane Roe falsely told "RO," her roommate, that she just "woke up in the morning with [Plaintiff] and came home," that she didn't remember going home with Plaintiff or being at his apartment, and that she woke up at his apartment and he was saying "nasty things" to her.

55.     Jane Roe's false statements, and the false statements set forth below, were made with a reckless disregard for the known damage they were likely to inflict upon Plaintiff. This was just the beginning though.

**JANE ROE CONDUCTS A SMEAR CAMPAIGN AGAINST PLAINTIFF**

56.     A few days later, Plaintiff texted Jane Roe to see if she was "down to chill tonight?" Jane Roe responded that it – *i.e.*, emotionless sex – was not something she wanted to continue because every time she had sex with the Plaintiff she felt "like shit" afterward.

57.     Plaintiff inquired as to why it made her feel shitty since "this isn't anything serious." Jane Roe replied that she didn't know and it didn't matter.

58.     Jane Roe did not tell Plaintiff that she did not want to have sex on March 9th, claim that he had taken advantage of her or that she was too inebriated to consent to sex on that date, or that she could not remember having sex on that date.

59.     Later in the same text string, Plaintiff and Jane Roe exchanged the following:

PLAINTIFF:  This is just getting weird at this point, even a good hookup is not worth w/e [whatever] is going on

ROE:        LOL [laugh out loud] … that's what I've been saying

60.     Plaintiff and Jane Roe's text conversation then took a turn for the worse. Plaintiff again accused Jane Roe of "spreading horrible shit" about him around campus and texted "all I really wanna do is just hate fuck you and your resentful ass," prompting this threat from Jane Roe:

> Are you fucking serious? I did not in any way spread ANY shit about you and for you to say that is so completely pitiful and sad, if you don't want to believe me that's fine, but after this just TRUST ME when I say you haven't seen anything from me. You think I'm not above talking shit about you? maybe I'm not! maybe from this point on, I WILL go around telling people just what a horrible person you were to me, i'm not a liar, bit i'm not going to hold back from telling the truth to anyone who wants to listen to me, and this time I will actually tell my friends to do the same.

61.     Jane Roe still did not tell Plaintiff that she did not want to have sex on March 9th, claim that he had taken advantage of her or that she was too inebriated to consent to sex on that date, or that she could not remember having sex on that date.

62.     Soon after her threat of "TRUST ME when I say you haven't seen anything from me," Jane Roe began a malicious smear campaign against Plaintiff designed to destroy his reputation and inflict severe emotional distress on him.

63.     Knowing that Plaintiff and his fraternity brothers were going to Cancun over Spring Break and would be staying at the same hotel as Jane Roe and her friends, Jane Roe obtained a No Contact Directive (NCD) from UC before the trip.

64.     While on Spring Break, Plaintiff abided by the NCD. As Jane Roe herself attested: "no direct contact was made."

65.     Nevertheless, Jane Roe complained that:

[Plaintiff] was with some other random girls for a few days, and he and them would constantly walk past us, whether it be in the pool, while we were sitting on the pool deck, or when we were sitting at one of the bars … it appeared that he was constantly trying to remind me that he was right there.

66.     Jane Roe's anger boiled over. While in Cancun, Jane Roe falsely and maliciously told "AM," her sorority sister, that Plaintiff had engaged in "nonconsensual sex" with her and that, when she tried to leave his apartment, Plaintiff would not let her leave "because he had not fucked her yet."

67.     Proving the truth of Jane Roe's threats that her friends would not hold back in repeating to others her comments about Plaintiff, AH repeated Jane Roe's lies to the male UC students staying at the resort and to Plaintiff's fraternity. AH would later arrange to have Jane Roe send an anonymous complaint to Plaintiff's fraternity repeating false accusations for the purpose of having him kicked out.

68.     Jane Roe also loudly told a group of girls within earshot of Plaintiff's fraternity brothers, including "MS", to "watch out for [Plaintiff] because there is a fine line between what he thought was consent was and what consent was not."

69.     Jane Roe falsely and maliciously told "LM," another UC student, that before Spring Break, "she woke up at [Plaintiff's] apartment and realized [Plaintiff] had raped her. [Jane Roe] said she remembered hearing [Plaintiff] say she could not leave the apartment because he

13

had not fucked her yet and waking up the next morning to him throwing her things at her and telling her to get out of the apartment."

70.    Jane Roe falsely and maliciously told RO, that she felt like Plaintiff "raped" her.

**JANE ROE FILES A FALSE COMPLAINT AGAINST PLAINTIFF**

71.    On April 2, 2018, Jane Roe met with Jeremy W. Inabinet, Associate Dean of Students in the University for Disciplinary Affairs. On information and belief, Jane Roe repeated many of the false and defamatory statements set forth above.[2]

72.    On April 5, 2018, Jane Roe made a false and defamatory complaint to Inabinet accusing Plaintiff of domestic violence and sexual misconduct. Among the false and defamatory statements Jane Roe levied at Plaintiff were the following:

  a.    One time, Plaintiff "pinned her to the bed and choked her;"

  b.    "One time [Plaintiff] pinned [Jane Roe] and [Jane Roe] tried to fight [Plaintiff] off. [Plaintiff] was able to force himself inside [Jane Roe] and [Jane Roe] eventually gave up;"

  c.    One time, Jane Roe "woke up with [Plaintiff] inside her;" and

  d.    She "blacked out" on the night of March 9th but remembered "being at [Plaintiff's] apartment and [Plaintiff] saying she could not leave because he had not fucked her yet."

73.    On April 5, 2018, Inabinet e-mailed Plaintiff that he was conducting an investigation. The only detail he provided was the following:

> I recently received information that you may have been involved in or have information regarding incidents that took place from Autumn 2017 Quarter to the Spring 2018 Quarter. It was reported you engaged in abusive behavior directed towards Jane Roe, while the two of you were in a dating relationship. Additionally, it was reported you engaged in non-consensual sexual activity with Jane Roe, both during and after your relationship.

---

[2] Plaintiff's information and belief is based upon Inabinet's typed interview notes.

14

74.     On April 11, 2018, Inabinet met with Plaintiff. Inabinet did not provide Plaintiff with a copy of Jane Roe's complaint, her witness statement, or any other document delineating the accusations that were being made against him.

75.     Although the *Student Manual: University Policies and Regulations, 2017-2018* of UC (the "Student Manual") requires that "the Associate Dean of Students in the University will inform the respondent of the alleged misconduct and will discuss the allegation," Inabinet did not do so.

76.     Rather, Inabinet asked Plaintiff about the history of his relationship with Jane Roe, the Costa Rica trip and their relationship thereafter, the night of March 9th, the planning for the Spring Break trip, and "about his relationship with [Jane Roe], specifically as it related to sexual activity," "how anger was handled in the relationship," and "if he had any expectations for [Jane Roe]" and similar questions.

77.     Plaintiff denied engaging in any abusive behavior or sexual misconduct.[3]

78.     During the interview, Plaintiff cross-complained against Jane Roe for punching him in the face and scratching his arm to the point of bleeding while in Costa Rica. He also complained about an incident in which Jane Roe demanded to see his penis and then, when he refused, chased him around for a long period of time trying to pull down his underwear until he finally relented.

**THE "INVESTIGATION"**

79.     On April 17, 2018, Inabinet emailed Plaintiff that UC would conduct an investigation and hold a hearing of the University-wide Student Disciplinary Committee (the "Committee") for alleged violations of the Student Manual, including the University's Policy on

---

[3] Plaintiff did admit to spitting on Jane Roe after she punched him in the face and raked his arm drawing blood.

15

Discrimination, Harassment, and Sexual Misconduct (Exhibit A, attached). Plaintiff was instructed "to provide a written statement about the alleged incident(s)."

80. Plaintiff, however, had still not received any information regarding "the alleged incident(s)" beyond the vague references to "abusive behavior" and "non-consensual sexual activity" referenced in Inabinet's April 5th e-mail. Plaintiff was left to try to deduce the allegations being made against him based upon the questions asked of him in Inabinet's April 11th interview.

81. Plaintiff was afforded the opportunity to provide Inabinet with the names of witnesses to be interviewed regarding the "alleged incident(s)" that were not identified.

82. On April 24, 2018, Plaintiff submitted a statement generally describing his relationship with Jane Roe, the Costa Rica incident (including pictures of his injuries when Jane Roe punched and scratched him), his and Jane Roe's Winter Quarter consensual sexual relationship, and the night of March 9th. In his statement, Plaintiff denied what he surmised were allegations of sexual misconduct or dating violence based on Inabinet's questions from April 11th. Plaintiff also provided a list of potential witnesses as best he could in light of the fact that he had not been informed of the specific allegations against him.

83. Accordingly, Plaintiff wrote in his statement that "I have yet to receive any official information related to the specific 'alleged incidents' I am being accused of. I can only deduce what the accusations are based on the questions that were asked of me in my meeting with Jeremy Inabinet."

84. On April 25, 2018, Inabinet e-mailed Plaintiff that the Committee would consider his cross complaint against Jane Roe for punching him in the face, digging her nails into his arm,

16

and physically attempting to pull his underwear down to examine his penis over his continual objections.

85.     On April 27, 2018, Plaintiff was informed by UC that a hearing would occur in the middle of his final exams on May 31st.

86.     On May 17, 2018, Inabinet e-mailed Plaintiff that he would be given access to the "investigation file."  This was the first time that Plaintiff saw Jane Roe's allegations against him.

87.     In the investigation file, UC did not delineate which of the "facts" in Jane Roe's 22-page narrative it considered to be the allegations of misconduct or abuse with which Plaintiff was being charged.  Nor did UC identify the specific charges being brought against Plaintiff aside from "possible violation of the University Policy on Harassment, Discrimination, and Sexual Misconduct" and the general headings "Sexual Misconduct and Definitions" and "Consent."

88.     The investigation file included summaries of 26 witness interviews conducted by Inabinet.  According to the file, "individuals were given the opportunity to speak, undirected, about any information they felt was relevant to the case. Inabinet asked follow-up questions as necessary to clarify information."

89.     Although the witness summaries were filled with second and third hand hearsay, gossip and campus rumors, the summaries of witnesses with actual first-hand knowledge of events involving Plaintiff and Jane Roe overwhelmingly supported Plaintiff's denials of wrongful conduct.

90.     Not a single person testified to witnessing Plaintiff commit an act of violence against Jane Roe.  And Jane Roe never told anyone that Plaintiff had ever committed an act of

violence against her. To the contrary, Plaintiff's roommates – with whom Jane Roe was living with during the Autumn Quarter – stated that they never even heard Plaintiff and Jane Roe argue.

91.     Further, until her friends found out on March 10th that she was secretly having sex with Plaintiff again, Jane Roe had not complained to anybody that Plaintiff had ever acted in an inappropriate manner, much less that he committed an act of sexual misconduct.

92.     As for the evening of March 9th, the third-party witness summaries uniformly rejected Jane Roe's claim that she was blackout drunk or otherwise incapacitated on that evening.  The file also contained Inabinet's summary of his interview with CG, which described her exculpatory one hour facetime conversation with Jane Roe at 3 a.m.

93.     The file made clear that Jane Roe's allegations were not only uncorroborated, but that there were numerous, material inconsistencies in the statements she made to Inabinet on April 5th, her written statements, and the after-the-fact comments she made to third parties.

94.     In sum, the investigation file revealed no rational basis on which anyone could conclude that Plaintiff had engaged in abusive behavior or sexual misconduct.

95.     While this should have been obvious to the Committee, Inabinet and anyone else who chose to conduct a fair and impartial review of the investigation file, it would have been proved beyond any reasonable doubt had UC afforded Plaintiff with any semblance of a fair hearing process. It didn't.

96.     Instead, Plaintiff (a college student with no legal training) was first provided Jane Roe's statement and 26 third-party witness summaries less than 2 weeks before a disciplinary hearing that UC scheduled in the middle of his final exams. Further, UC instructed Plaintiff that he was not entitled to have legal counsel represent him at the hearing, he was not allowed to reach out to witnesses and he would have no right of cross-examination at the hearing.

97.     Further, although Inabinet's April 17th letter expressly stated that "Individuals solely providing character information will not be considered as witnesses," Inabinet loaded the investigation file (and provided the Committee) with improper character testimony. Improper statements about the "type of person [Plaintiff] was," that girls "had been warned about [Plaintiff] from other members of her sorority," that Plaintiff "makes a lot of people uncomfortable, not just [Jane Roe]," that Plaintiff "is frightening," and that "upperclassmen in their sorority warned [Jane Roe] about [Plaintiff]" abound in the investigation file.

98.     Indeed, the vast majority of witness summaries Inabinet submitted from interviews with Jane Roe's friends and sorority sisters contain no first hand information. Rather, they are filled with statements about what they "heard" from other people, opinions that Plaintiff is a bad person, and their recounting of Jane Roe's bashing of Plaintiff during and after the Spring Break trip. The cumulative effect of these wholly improper statements, which were presented to the Committee without any cross-examination, undoubtedly had a substantial effect on the Committee.

99.     Inabinet also provided the Committee with an interview summary from Plaintiff's ex-girlfriend, who had no personal knowledge of Plaintiff's relationship with Jane Roe, as well as an e-mail from her sister in direct violation of the Student Manual.  Although the statement made to Inabinet were demonstrably false, they clearly impacted the Committee as the student member of the Committee asked Plaintiff pointed questions about that relationship at the hearing. The witness summary contained zero facts regarding any of the incidents that purportedly were the subject of the hearing. Rather, it was a base character attack. Inabinet stacked the deck with this witness summary despite the Student Manual's prohibition on allowing a respondent's sexual history with others to be considered.

100.     With respect to Plaintiff's cross complaint against Jane Roe, the file showed that Inabinet re-interviewed Jane Roe on May 2, 2018, and that she admitted the allegations against her.[4]  Specifically, Inabinet's interview summary states: [Jane Roe] said she does not deny what she did in Costa Rica. [Jane Roe] did hit [Plaintiff] and said the scratches on his arm were caused when [Plaintiff]pulled his arm out of [Jane Roe's] grip."  Similarly, Jane Roe did not deny Plaintiff's allegations regarding her attempts to see his penis over his objections.

**THE SHAM HEARING**

101.     On May 31, 2018, the Committee convened for a hearing.

102.     The Committee only invited two witnesses to the hearing – Plaintiff and Jane Roe. Nobody else was allowed to testify.

103.     Plaintiff and Jane Roe were kept in separate rooms and only allowed to see each other's testimony via closed circuit television.  When it was his turn to testify, Plaintiff testified consistent with his previous statement that he had not engaged in any sexual misconduct or dating violence.

104.     The student member of the Committee, who Plaintiff learned had previous relationships with two of his friends and therefore should never have been on the Committee, asked Plaintiff about his relationship with his previous girlfriend.  When Plaintiff responded that he understood that previous relationships were not an appropriate avenue for inquiry, the student member demanded he answer.

105.     Although the Committee was provided Inabinet's 26 witness summaries, they did not interview any of the witnesses and, therefore, had no basis to make credibility determinations of any of the witnesses.

---

**THE COMMITTEE'S GENDER BIASED DECISIONS**

106.    On June 5, 2018, the Committee issued two decisions, one on Jane Roe's complaint and one on Plaintiff's cross complaint. Plaintiff lost both.  (See Exhibit B and C attached).

107.    Neither decision was grounded in the evidence presented before the Committee. Rather, both were arbitrary, capricious and based upon a discriminatory intent to favor the female student, Jane Roe, over the male student, Plaintiff.

108.    The Committee simply chose to give credence to each and every one of Jane Roe's bare allegations without any regard to the overwhelming contrary evidence. The disparate manner in which the Committee decided Jane Roe's complaint and Plaintiff's cross complaint demonstrates a gender based discriminatory bias.

109.    The Committee's decision on Jane Roe's claims against Plaintiff is set forth in four paragraphs.

110.    In the first of these paragraphs, "the Committee concluded there were instances of physical abuse committed by [Plaintiff] during the relationship. These included instances of choking [Jane Roe], spitting on [Jane Roe], and engaging in behavior that caused bruising."

111.    Jane Roe did accuse Plaintiff of choking her on one occasion. Plaintiff flatly denies having done so. Jane Roe did not identify the date or even the general time frame when this supposedly occurred, and despite the patently serious nature of this claim, there is no evidence that she ever mentioned it to Plaintiff, any of her family or friends, or anyone else, much less filed a formal report or charges of any kind. Nor did she stop seeing with Plaintiff thereafter.  Just the opposite, she continued staying at his apartment the rest of the Quarter and invited him to Costs Rica.

21

112.    Jane Roe did not testify to a single incident involving Plaintiff that caused her to bruise.

113.    Mr. Inabinet's notes state that "at one point during the Autumn Quarter, [RO] told her academic advisor about bruises she had seen on [Jane Roe]. At the time, [Jane Roe] did not see the bruises as an issue but has since realized there were a lot of things wrong with her relationship with Plaintiff." Mr. Inabinet did not testify about the bruising or clarify the "things" he referenced in his notes. According to RO's interview summary, she made only a brief reference to this issue, saying that she asked Jane Roe about the bruises "and [Jane Roe] attributed them to rough sex. [Jane Roe] did not say much more about it."

114.    Plaintiff denies having caused Jane Roe any bruises, claiming that the bruises he did see on Jane Roe's body were largely attributable to Jane Roe's own clumsiness, which often caused her to stumble and fall or bump into things, particularly when she was drunk.

115.    Plaintiff supported his position with text messages between him and Jane Roe in which she good-naturedly acknowledged that her clumsiness was the source of her bruising, including falling off a see saw.  Jane Roe's text messages to Plaintiff were also supported by the witness statement of "MT", a friend of Jane Roe, who stated that Jane Roe told her she bruised "from falling clumsily or messing around with [Plaintiff]."

116.    The witness statement of "MS" recounted how Jane Roe fell through a glass table to the ground, cutting Jane Roe pretty badly.  Jane Roe sent a picture out to social media after the incident, on March 11, 2018, showing her badly bruised legs with the caption, "My RA's just expressed concern for me after seeing my super bruised legs and I had to explain to them that I just fell through a glass table and am not, in fact, being abused."

117.    Next, the Committee wrote that "throughout the relationship, there seemed to be an increase in the severity of the actions, which culminated in a fight in Costa Rica." This is a puzzling comment, as Jane Roe herself does not claim that there was an "increase in the severity" of Plaintiff's actions as the fall 2017 quarter progressed and the Committee did not explain what it meant by this statement or cite any evidence in support of it.

118.    The Committee then turned to the Costa Rica incident. In its decision upholding Jane Roe's claims against Plaintiff based in part on that incident, the Committee described it as follows:

> [Plaintiff] initiated a fight with [Jane Roe] by slapping her back with shaving cream while [Jane Roe] was in the shower. This resulted in physical contact between [Plaintiff] and [Jane Roe], and ended when [Plaintiff] deliberately spit on [Jane Roe]."

119.    There is no dispute about the order in which the three parts of this incident took place, but the way the Committee chose to describe those them is a highly telling indication of its bias against Plaintiff.

120.    The Committee's statement that Plaintiff "initiated a fight" with Jane Roe by putting shaving cream on her back while she was in the shower simply ignored the undisputed evidence that during their relationship Plaintiff and Jane Roe frequently engaged in pranks involving physical contact, many of which were initiated by Jane Roe. As she herself put it, "we liked to mess around with each other, play pranks on each other, and sometimes this would get physical in a mutual and joking way."

121.    And Jane Roe herself brought up the previous instance in which Plaintiff had put shaving cream on her: "[Plaintiff] also included a picture of the first time he put shaving cream on me, and [he] said I thought it was funny. This is true, I thought it was really funny – but it was

also situational, and I wasn't upset about it because he hadn't hurt me while doing it and did it right before I was about to get in the shower so I could easily wash it off."

122.     Plaintiff and Jane Roe had been arguing in the days leading up to this incident, but even Jane Roe does not say that Plaintiff was trying to "initiate a fight" when he put the shaving cream on her back, nor does she claim that he hurt her, even slightly, in doing so. She says only that what he did was "extremely unnecessary." In light of their history, it is patently obvious that Plaintiff was just trying to break the tension with Jane Roe by doing something she had in the past found to be "really funny" (and this time when she was already in the shower). Thus, the Committee's decision to characterize this first part of the incident as Plaintiff "initiating a fight" is a clear and willful mischaracterization of the evidence.

123.     Jane Roe responded to the shaving cream by punching Plaintiff in the face then grabbing his arm and digging her fingernails into it hard enough to draw blood. There is no dispute about either of these facts, as Plaintiff submitted pictures of his black eye and bleeding arm, and Jane Roe admits to both actions, claiming only that when she hit Plaintiff in the face it was more of a slap than a punch, and blaming him for the blood by saying he should not have tried to pull his arm away while she was digging her fingernails into it.

124.     The Committee blatantly escalated its bias by attempting to neuter this part of the incident, describing it as "physical contact between [Plaintiff] and [Jane Roe]," a characterization that: (a) avoids attributing responsibility for the physical contact to Jane Roe; (b) ignores the undisputed fact that Jane Roe acted deliberately; and (c) hides the serious nature of Jane Roe's assault with generic language ("physical contact") instead of describing it specifically (as the Committee did in describing the shaving cream part of the incident). Any doubt about the

24

Committee's bias is eliminated by the rest of its sentence, which goes on to describe the third part of the Costa Rica incident as one in which "[Plaintiff] deliberately spit on [Jane Roe]."

125.    The Committee's conscious effort to unfairly slant the facts of this incident against Plaintiff and in favor of Jane Roe could hardly be more obvious.

126.    In the second paragraph of its decision, the Committee "concluded that [Plaintiff] continued to find ways to insert himself into the life of [Jane Roe] for no other reason but to cause her emotional distress." Emblematic of the lack of dues process afforded Plaintiff, UC never informed Plaintiff prior to the hearing that this was even a charge being brought against him.

127.    As support for this aspect of its decision, the Committee found Plaintiff guilty of two things: "intentionally engaging in behavior in front of [Jane Roe] while on a group trip in Cancun for spring break and attending an Anchor Slam event hosted by [Jane Roe's] sorority. All of these actions were committed after the NCD had been issued by the University."

128.    Yet, Jane Roe flatly admits that while she and Plaintiff were on the trip "no direct contact was made." Because the Committee did not have the NCD, it could not possibly have rejected this concession and found otherwise, nor is there any (permissible) basis on which it could have concluded that Plaintiff violated the directive by "indirect" contact of some kind.

129.    It is also worth noting that: (a) at the time the NCD was issued, Plaintiff had already paid non-refundable down payments for travel and lodging that he would have lost if he had canceled his trip entirely, and (b) several of the other students who were on the trip provided witness statements quite definitively asserting that Plaintiff was consciously trying to avoid any interaction with Jane Roe while they were in Cancun.

130.     With respect to the Anchor Slam event, the entirety of the testimony on that matter consists of a brief statement by witness "SH" and a comment on that statement by Jane Roe. SH's statement is as follows:

> Delta Gamma hosts an event called Anger Slam. The pre-event was held on May 2, 2018. It is very obvious that it is a DG event. Members wear t-shirts and there are signs everywhere. [Plaintiff] showed up at the pre-event. Some of the members of DG asked their sorority president if she could ask [Plaintiff] to leave. The president did go up to [Plaintiff] and asked him to leave and told him he could wait outside while someone got his food and he left. The event was held in the McCormick Lounge in Reynolds Club. [Plaintiff] only went to the pre-event but not to the actual Anger Slam event.

131.     And this is Jane Roe's statement:

> In [SH's] statement, an event put on by Delta Gamma "Anger Slam" is mentioned. This event is actually called "Anchor Slam" and is our yearly philanthropy event to raise money for Service for Sight. We had a pre-event to raise awareness for it, and [Plaintiff] attempted to come into it. As soon as he entered McCormick Lounge, my friends saw and ran over to warn me. I had previously told them that every time I see him I freak out, and they wanted to make sure I was okay. I looked over and saw him, and had a small panic attack. My friends had to sit me down in a corner while I stopped crying and got my breath back. They had also asked the president of the sorority to ask him to leave, as he was making me extremely uncomfortable.

132.     Thus, there is absolutely no factual basis for the Committee's conclusion that this event is an example of Plaintiff "find[ing] ways to insert himself into the life of [Jane Roe] for no other reason but to cause her emotional distress," nor is there any evidence that he was violating the NCD in connection with this event.

133.     In the third paragraph of its decision, the Committee wrote the following:

> Lastly, [Plaintiff] engaged in non-consensual sexual activity on multiple occasions with [Jane Roe] during the course of their relationship, and on March 9, 2018 after the dating relationship had ended. During the relationship, [Plaintiff] engaged in coercive behavior to get [Jane Roe] to participate in sexual activity after [Jane Roe] clearly expressed a desire not to participate, and [Plaintiff] engaged in sexual activity with [Jane Roe] while she was incapacitated. The coercive behavior included shaming, name calling, and repeatedly asking for sex after being told no. On at least one occasion, [Jane Roe] awoke to [Plaintiff]

attempting to penetrate her vagina with his penis. University policy clearly states that a person who is asleep is deemed to be incapacitated and cannot consent to sexual activity; thus this behavior is a direct violation of University policy. Though [Plaintiff] stopped the activity after [Jane Roe] awoke and told [him] to stop, this is further evidence of [Plaintiff's] lack of consideration for [Jane Roe] during their relationship.

134. First, the Committee's first and most important finding in this paragraph—that Plaintiff "engaged in non-consensual sexual activity on multiple occasions with Jane Roe during the course of the relationship"—ignores so many of Jane Roe's direct admissions to the contrary that it cannot possibly be viewed as the finding of a neutral body.

135. In her statements, Jane Roe discussed with great specificity a number of instances of sexual intercourse that took place between her and Plaintiff after they returned to campus for the Winter Quarter 2018. She admits that "the time when we were seeing each other [after they returned to school] started on Wednesday, January 24, 2018 at Bar Night."

136. Jane Roe states they then had consensual sex on the night she lied to her friends about sleeping on Plaintiff's couch. Jane Roe once again admitted that, on January 28th, "if we did have sex that night, it would have been consensual."

137. The next incident Jane Roe described took place on February 4th after Plaintiff took her to dinner. She says that Plaintiff then pressured her to have sex, which she did not want to do because she had homework to get to. She writes that "we did have sex, and it was consensual but coerced. I did not sleep over, as I had work to do that night." Next, Jane Roe says she saw Plaintiff on February 8th before he left to go to New Orleans for Mardi Gras. She writes that "assuming we had sex then, it would have been consensual."

138. Jane Roe then summarized this period of time by admitting that Plaintiff was correct in saying that she "got what she wanted." She says that while she was still upset about

27

what had happened in Costa Rica, "in a way, I was just letting him buy me food and was having sex with him to satisfy my own desires, as I knew he would be willing."

139.    And, Jane Roe made yet another clear and significant admission:

I will say once again that each time we had sex post-relationship was consensual, and the only times of sexual misconduct (in any sense) that I would like to bring attention to happened a few times during our relationship, with the most serious violation occurring on March 9.

140.    The Committee's own decision illustrates its patent bias. In addition to writing that Plaintiff and Jane Roe "engaged in non-consensual sexual activity on multiple occasions" in the face of Jane Roe's repeated and specific admissions to the contrary, the Committee criticized Plaintiff for "name-calling" and "shaming" Jane Roe into having sex, but it did not criticize Jane Roe for "us[ing] him for sex when I want it and hav[ing] no emotional connection."

141.    The only specific incident that the Committee cites in this part of its decision (aside from the March 9 incident) is one in which no sex took place and its criticism of Plaintiff is that he displayed a "lack of consideration" for Jane Roe. Suffice it to say that by Jane Roe's own admission if there was indeed a "lack of consideration" in the relationship it was mutual, and that the penalty that the Committee imposed on Plaintiff is far more severe than any that could possibly be warranted for a "lack of consideration."

142.    The fourth paragraph of the Committee's decision addressed Jane Roe's allegations surrounding March 9th.  The Committee viewed the sole issue with respect to what happened that evening as whether Jane Roe was sufficiently sober to consent to sex and, if she wasn't, whether Plaintiff should have known that.

143.    The definition of "consent" contained in the Student Manual is as follows:

**"Consent"** means voluntary, active and clear agreement, communicated by words or actions, to participate in specific sexual activity. Consensual sexual activity happens when each participant willingly chooses to participate.

28

In cases where a victim asserts that sexual activity occurred without consent, the standard is whether a sober, reasonable person in the same circumstances as the respondent should have known that the victim did not or could not consent to the sexual activity in question.

144.    The Student Manual provides that consent cannot be obtained from someone who is incapacitated. "Incapacitation" is defined in the manual as "when a person's perception and/or judgment is so impaired that the person lacks the cognitive capacity to make or act on conscious decisions … Incapacitation due to alcohol or drug use is a state beyond 'mere' incapacitation or even being drunk.  Indicators of incapacitation may include inability to communicate, lack of control over physical movements, and/or lack of awareness of circumstances."

145.    The Student Manual sums up the intersection of these two definitions as follows:

In sum, an act will be deemed non-consensual if a person engages in sexual activity with an individual who is incapacitated, and who the person knows or reasonably should know is incapacitated ….

146.    It was undisputed that, in Winter Quarter 2018, Plaintiff and Jane Roe were engaged in a consensual sexual relationship whereby Jane Roe would only visit Plaintiff's apartment to have emotionless sex with Plaintiff. It was also undisputed that, consistent with this practice, Plaintiff texted Jane Roe on the evening of March 9th to come to his apartment and that Jane Roe accepted his invitation.

147.    Jane Roe claims that she got very drunk early in the evening and remembers very few details of the evening, and that it should have been obvious to Plaintiff that she was not sufficiently sober to consent to sex. Plaintiff does not dispute that both he and Jane Roe drank early in the evening but insists that they were both quite sober when they had sex at 5 o'clock in the morning.

148.    The Committee essentially accepted Jane Roe's statement that since she claims not to remember anything about the sexual activity, she must not have been able to consent and Plaintiff should have known that. In doing so, however, the Committee simply ignored Jane Roe's admissions that she does indeed have specific recollections of what happened that evening; it's just that her recollections are very selective and designed to make Plaintiff look bad.

149.    For example, in her opening statement, she says she remembers "trying to stand up and saying 'I want to go home' and [Plaintiff] responding 'you can't leave, I haven't fucked you yet' and pulling me back onto the bed." Then, in her supplemental statement, she adds a recollection that "[Plaintiff] did not offer for me to stay the night—he threw my clothes at me and said 'you should go' at around 6:00 am." In light of this evidence, and the other indications of bias detailed in this letter, the Committee's decision to accept Jane Roe's claim that she remembers "nothing" would be dubious even if that was all that it had to go on.

150.    But that was not all that the Committee had to go on. Far from it. It had CG's witness summary that Jane Roe participated fully in an hour long FaceTime conversation, was coherent, not slurring her words, and expressed a desire to engage in consensual sex with Plaintiff. CG's statement obviously and completely corroborates Plaintiff's version on all the important details of this evening and it is highly credible, as CG knew both Plaintiff and Jane Roe, knew about their relationship, was familiar with how they acted when they had been drinking, and had been with both of them earlier in the evening.

151.    Most significantly, of course, because CG was on a Facetime call with both Plaintiff and Jane Roe in which they told her they were about to have sex (and were in bed with most of their clothes off), she was directly attuned to the issue of consent. Moreover, because the call lasted an hour and was a Facetime call in which CG could see as well as talk to both Plaintiff

and Jane Roe, she clearly had a sound basis for judging Jane Roe's ability to consent. Finally, her opinion on the key issue was not vague or qualified.

152.    But that is not the only independent evidence that the Committee chose to ignore. In addition to CG, two other students who were with Plaintiff and Jane Roe earlier that evening, KC and LP, also testified that Jane Roe was not incapacitated.

153.    There was no evidence that Plaintiff was presented with "indicators of incapacitation." Rather, the uncontroverted evidence was that Jane Roe did not show any indication of incapacitation when she went to Plaintiff's apartment for the purpose of having sex with him consistent with their normal course of conduct, or when she did have sex with him some 4+ hours after she quit consuming alcohol

154.    For the Committee to ignore entirely all of this independent third-party testimony that squarely and overwhelmingly supports Plaintiff's version of events, and treat the March 9th incident as a choice between believing Jane Roe's version of what happened that evening or Plaintiff's, can only be viewed as clear evidence of its bias in this matter.

155.    The manner in which the Committee disposed of Plaintiff's cross-complaint against Jane Roe is further evidence of its gender bias.

156.    The Committee decided that Jane Roe's actions in giving Plaintiff a black eye by hitting him in the face and scratching his arm hard enough to draw blood were not sufficient to constitute domestic violence because "the physical response of [Jane Roe] was a direct reaction to physical behavior initiated by [Plaintiff] and was an isolated event during the course of the relationship."

157.    With respect to the first asserted justification the Committee used the fact that Plaintiff spit on Jane Roe as part of the basis of its decision against him, even though his spitting

31

occurred *after* he was punched and was therefore also "a direct reaction to physical behavior initiated by Jane Roe." Moreover, Jane Roe was reacting to a prank of Plaintiff's that she had previously found to be "really funny," while Plaintiff was reacting to a serious assault. If anything, therefore, the Committee's rationale applies far more clearly to Plaintiff's reaction than to Jane Roe's. Thus, its finding that the opposite is true—that Jane Roe's conduct was a defensible "reaction" but Plaintiff's was not—can only be viewed as the product of bias.

158.    The Committee's comment about Jane Roe's assault being excusable because it was an "isolated event" is just as troubling. UC's Student Manual does not contain a "one-punch" rule that allows its students one free punch to the face of another student. And, if it did, it would also excuse Plaintiff from the single instance in which he spit on Jane Roe.

159.    The Committee went on to say that Jane Roe's actions "came at the end of the relationship with [Plaintiff] where [Jane Roe] had been physically and emotionally abused by [Plaintiff]." This statement is wrong as, by Jane Roe's own admission, she and Plaintiff had sexual intercourse on a number of occasions after they returned to campus in January, each and every one of which (except for the one on March 9) she herself describes as "consensual." But even if the Committee's statement was true, the timing of the Costa Rica incident cannot matter for Plaintiff's cross complaint but not Jane Roe's complaint.

160.    The Committee concluded its disposition of this claim by saying that "this fight seemed to be the culmination of events between [Jane Roe] and [Plaintiff]." This statement is not true, it is not clear what it means, and it certainly is not a legitimate basis for the Committee to reject Plaintiff's complaint.

161. The Committee exhibited the same bias in disposing of the second incident complained of by Plaintiff wherein he complained of Jane Roe's physical attempts to see his penis.

162. Jane Roe does not dispute any of these facts, except to say that she wanted to see Plaintiff's penis because she feared that he had contracted a sexually-transmitted disease. Thus, Jane Roe concedes that this incident took place, and Plaintiff's version of its important aspects is un-rebutted.

163. Faced with this evidence, the Committee wrote that it had:

> received conflicting, but similar versions of the event from [Jane Roe] and [Plaintiff]. In evaluating the information received, the Committee unanimously concluded that the behavior described in both scenarios would not rise to the level of a policy violation. Though [Jane Roe] did ask to see [Plaintiff's] penis, the request did not cross the threshold of being severe or pervasive, and according to [Jane Roe], [Plaintiff] thought the actions of [Jane Roe] were cute.

164. The Committee did not explain why it found that Jane Roe's conduct was not severe or pervasive, as it clearly was in light of the undisputed facts that Jane Roe: (a) did not just ask to see Plaintiff's penis, she chased him around the apartment trying to pull down his pants; (b) she continued doing that even after Plaintiff asked her "very seriously" to stop; and (c) when Jane Roe was not initially successful in pulling down Plaintiff's pants, she waited a while, then tried to sneak up on him and pull them down when his guard was down.

165. This finding is yet another illustration of the Committee's bias against Plaintiff and in favor of Jane Roe for a second reason, as it criticized Plaintiff for "engag[ing] in coercive behavior to get [Jane Roe] to participate in sexual activity after [Jane Roe] clearly expressed a desire not to participate," while excusing Jane Roe's coercive behavior to pull down Plaintiff's pants even after he clearly and seriously asked her not to do so.

166.    The Committee's punishment was draconian. Knowing that Plaintiff had completed his finals and was four days away from graduation, the Committee expelled Plaintiff:

> **Expulsion** – An expulsion means a student automatically forfeits all rights and privileges as a student in the University. Any student expelled from the University must refrain from visiting the University premises except when engaged in official business approved in writing by the Dean of Students in the University, or designee.  This expulsion is immediate and includes a withdrawal from the Spring Quarter 2018. Decisions of expulsion will be recorded on the student's transcript and will read, "Not permitted to register, must reapply. Michele Rasmussen, Dean of Students in the University, May 31, 2018."

167.    Plaintiff timely appealed the Committee's decision to the Dean of Students, but she denied his appeal on July 25, 2018, thereby exhausting all of his options for administrative review.

168.    As a result of Jane Roe's false and defamatory statements and the Committee's decision, Plaintiff was expelled and denied the degree he earned.

169.    Additionally, although Plaintiff had already accepted a job to commence after graduation, it was contingent upon his successful completion of his studies at UC and receipt of his degree. With his expulsion, Plaintiff lost his job.

170.    Without a degree, without a job, and with a finding that he has engaged in sexual misconduct and abuse, Plaintiff's once bright employment future has been permanently damaged.

171.    As a result of these events, Plaintiff has suffered from severe anxiety, depression, humiliation and suicidal ideation.

172.    The severe emotional distress inflicted upon Plaintiff was compounded by Jane Roe's continuing efforts to smear his name, including providing false and defamatory statements for an article in *The Chicago Maroon*, the UC student newspaper, titled: <u>Fourth Year Student Expelled for Sexual Assault a Week Before Graduation</u>.

34

**THE U.S. DEPARTMENT OF EDUCATION AND STATE OF ILLINOIS COERCE UC
TO DEPRIVE STUDENTS OF THEIR BASIC DUE PROCESS RIGHTS**

173.    An a federally-funded university, UC is forced to follow the guidelines and rules promulgated by the Department of Education or risk losing millions of dollars in federal funds.

174.    On April 11, 2011, the United States Department of Education ("Department") sent a "Dear Colleague" letter to universities receiving federal funds mandating steps universities needed to take in order to comply with Title IX (the "2011 Letter").  Universities that failed to follow the mandates of the 2011 Letter risked losing millions of dollars in federal funding.

175.    According to the 2011 Letter, the mandates were designed to remedy the problem of women being the victims of sexual assault or attempted sexual assault and, in particular, being victims when they are incapacitated by alcohol.

176.    These mandates made it more difficult for male students to defend themselves from allegations of sexual misconduct by lowering the burden of proof against those accused, denying the accused's right to cross exam the complainant or witnesses, minimizing the number of times complainants are interviewed, and placing an emphasis on the speed of resolution over basic due process rights.

177.    In January 2014, the U.S. Department of Education Office of Civil Rights ("OCR") opened a formal investigation at the UC for potential Title IX violations for its alleged failure to aggressively handle sexual misconduct complaints against male students in accordance with the 2011 Letter.

178.    On April 29, 2014, the Department issued guidance to universities that receive federal assistance.  (the "2014 Guidance"). As with the 2011 Letter, the 2014 Guidance placed an emphasis on prompt resolution of complaints over an accused's rights to due process. To that

end, it provides: "Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protection by Title IX to the complainant."

179.    The 2014 Guidance also stressed that the 60 day calendar timeframe "refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing … to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community as appropriate."

180.    The 2014 Guidance informed universities that they did not have to allow the accused to cross-examine the complainant or witnesses; in fact, the complainants did not even have to attend a disciplinary hearing.

181.    To emphasize the point that speed in reaching a decision is paramount, the 2104 Guidance provided: "Although its timeframe does not include appeals, a school should be aware that an unduly long appeal process may impact whether the school's response was prompt and equitable as required by Title IX."

182.    A school's failure to move as rapidly as the Department mandated in either the 2011 Letter or 2014 Guidance, or to provide an accused more due process rights, would be treated by the Department as evidence of a hostile environment.

183.    Following in the footsteps of the Department, Illinois passed the Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/1 (the "PSVHEA"). PSVHEA mandated that universities located in Illinois adopt policies containing minimum standards related to the handling of sexual misconduct and dating violence complaints.

184.     These minimum complaint resolution procedures included requirements that universities use a preponderance of the evidence standard to determine if the violation occurred and denial of the right to cross examine the complainant.

185.     In response to pressure from the Department, the 2011 Letter, 2014 Guidance and the PSVHEA, UC began an overhaul of its sexual misconduct policies. These policies, which are now contained in the Student Manual, emphasize speed of resolution over due process. They stripped away an accused's right to cross-examination and right to legal counsel, lowered the burden of proof to preponderance of the evidence, and placed an emphasis on completing any disciplinary proceedings within 60 days over affording an accused due process.

186.     As part of it overhaul, UC hired Inabinet as the new Associate Dean.  In a major shift in the way disciplinary cases are handled, Inabinet announced "***The burden's placed on the individual obtaining consent***."

187.     On September 22, 2017, the U.S. Department of Education withdrew the 2011 Letter.  In doing so, the Department acknowledged that, as a result of the 2011 Letter, "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX or regulation.'"

188.     The Department further acknowledged that 2011 Letter and 2014 Guidance "led to the deprivation of rights for many students."

189.     As of the date of Plaintiff's expulsion, UC had not yet amended the due process denying provisions of its Student Manual that were adopted in the wake of the 2011 Letter and 2014 Guidance.

## COUNT I – VIOLATION OF TITLE IX
### (Against University of Chicago)

190.    Plaintiff realleges paragraphs 1-189 as if set forth herein.

191.    Title IX prohibits universities that receive federal financing from discriminating against students on the basis of sex, and provides a private right of action for students to seek redress for violations of the Act. 20 U.S.C. §1681(a).

192.    UC receives federal financing and is subject to Title IX.

193.    UC violated Title IX by reaching an erroneous outcome at Plaintiff's hearing because of his gender.

194.    As set forth in paragraphs 106-167, the Committee's decision was wrong or, at the very least, the facts contained herein cast articulable doubt on the accuracy of the hearing's outcome. This doubt of the accuracy of the disciplinary proceedings outcome against Plaintiff is best illustrated by:

a.    The Committee rejecting, without explanation, the third-party testimony of CG, KC, LP and FG that Jane Roe was not incapacitated or exhibiting any of the indicators of incapacitation on March 9th;

b.    The Committee finding that Plaintiff should have known that Jane Roe was incapacitated even though not a single one of the other witnesses who interacted with her that night believed she was incapacitated or testified that she presented with any indicators of incapacitation, and even though the witness testimony was that Plaintiff had much more to drink than Jane Roe that evening;

c.    The Committee adopting Jane Roe's bare and inconsistent testimony that she was too drunk to remember anything even though it was undisputed that she had not consumed alcohol for at least 4 hours before she engaged in sex and 5 hours before she left Plaintiff's apartment;

      d.    The Committee finding that Plaintiff caused bruising on Jane Roe without any testimony that he caused such bruising and in the face of Jane Roe's own texts and admissions that she bruised for reasons other than Plaintiff's actions;

      e.    The Committee finding that Plaintiff initiated a physical altercation in Costa Rica by playing a joke that Jane Roe previously said was "very funny;" and

      f.    The denial to Plaintiff of basic elements of fairness and due process as set forth in paragraph 205 below.

195.    The erroneous outcome was caused by UC's and the Committee's bias in favor of female complainants and against male respondents. This bias is best illustrated by:

      a.    The Committee's decision to credit exclusively testimony favorable to the female complainant and reject all testimony favorable to the male respondent, without any explanation or finding as to why they would deem such testimony more credible;

      b.    The disparate and uneven manner in which the Committee handled the respective claims of Plaintiff and Jane Roe. In particular, rejecting Plaintiff's cross complaint despite Jane Roe admitting the factual allegations against her;

      c.    The fact that the denial of Plaintiff's due process rights is directly related to UC's adoption of policies in response to the 2011 Letter, 2014 Guidance, the PSVHEA and pressure from the Department resulting from its failure to aggressively handle sexual misconduct claims made against male students; and

      d.    Inabinet's statement that the burden of proof is on the accused to prove consent.

196.    Further, as set forth in paragraphs 106-167, UC also violated Title IX through its selective enforcement of its disciplinary procedures based on gender by refusing to discipline

39

Jane Roe for her admitted violations of the Student Manual while expelling Plaintiff for his disputed violations of the Student Manual.

197.    As a direct and proximate result of its illegal discrimination, Plaintiff was damaged in that he was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job and suffered extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, the costs of this action and his attorneys' fees, and (b) an Order requiring University of Chicago to confer Plaintiff with the degree and honors he would have earned but for its wrongful conduct, and (c) such further relied this Court deems just and equitable.

## COUNT II – BREACH OF CONTRACT
### (Against the University of Chicago)

198.    Plaintiff realleges paragraphs 1-189 as if set forth herein.

199.    When UC enrolled Plaintiff in the university and Plaintiff paid his tuition and accepted his enrollment, UC and Plaintiff entered into a valid and binding contract.

200.    The terms of the contract between UC and Plaintiff can be found in the Student Manual and other catalogs and bulletins issued by UC.

201.    Included among the express terms of the Student Manual are the following:

    a.    "In all cases, the University is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent."

    b.    "The University does not discriminate on the basis of … sex."

c. In the resolution of complaints of sexual assault, dating violence or domestic violence, "the complainant's sexual history with others will generally not be sought or used in determining whether sexual assault has occurred. However, in certain circumstances the sexual history between the parties may have limited relevance to explain context."

d. In the event a student makes a claim of misconduct to the Associate Dean of Students in the University for Disciplinary Affairs, the Associate Dean "will inform the respondent of the alleged misconduct and will discuss the allegation."

e. If the university determines that a disciplinary committee is to be convened, the Associate Dean "will ask the complainant to submit in writing the allegation as well as any available documentation supporting the allegation. The Associate Dean … will inform the respondent of the allegation, give the respondent a copy of the [UC] disciplinary procedures and ask the respondent to prepare a written response to the accusation."

202. In dealing with claims of sexual misconduct, the Student Manual expressly states that it will use the definitions of "Consent" and "Incapacitation" set forth in paragraphs 143-145 above.

203. Additionally, the duty of good faith and fair dealing implied in every Illinois contract prohibits UC from acting in an arbitrary or capricious manner in disciplining Plaintiff and requires that disciplinary hearings be conducted with basic fairness.

204. Plaintiff fulfilled his contractual obligations to UC by paying his tuition and abiding by the policies set forth in the Student Manual.

205. UC breached its contractual obligations to Plaintiff by subjecting him to a disciplinary process that violated the express terms of the Student Manual and Plaintiff's right to basic fairness, including:

a. failing to notify Plaintiff in a timely manner of the charges he faced and factual predicate for each charge;

b. interviewing Plaintiff without providing him the allegations made against him;

c. failing to provide Plaintiff with Jane Roe's allegations prior to requiring Plaintiff to provide a written statement and list of witnesses;

41

d.  providing the Committee with interview summaries packed with improper character testimony and hearsay;

e.  providing the Committee with statements from Plaintiff's ex-girlfriend about their sexual history;

f.  including a student on the Committee who had previous relationships with Plaintiff's friends;

g.  discriminating against Plaintiff on the basis of is gender as set forth more fully in Count I;

h.  barring Plaintiff from contacting any witnesses prior to the hearing;

i.  denying Plaintiff the right to have counsel represent him;

j.  denying Plaintiff the right to call witnesses at the hearing;

k.  failing to hear any testimony from the 26 witnesses interviewed by Inabinet thereby making it impossible to make credibility determinations;

l.  denying Plaintiff the right to confront his accuser or to cross examine Jane Roe or any witnesses;

m.  using the lower "preponderance of the evidence" burden of proof;

n.  issuing a decision that did not comport with the Student Manual's definitions of consent or incapacitation;

o.  issuing an erroneous decision concluding that Plaintiff engaged in sexual misconduct and violence despite a lack of proof;

p.  issuing a decision that did not explain the basis for the Committee's resolution of factually disputed matters;

q.  applying different standards to the resolution of Jane Roe's complaint than those applied to the resolution of Plaintiff's cross complaint; and

r.  expelling Plaintiff based upon an arbitrary, capricious, discriminatory and clearly erroneous decision by the Committee.

206.     UC's actions lacked any rational basis were such a complete departure from accepted academic norm as to demonstrate that neither it, the Committee, the Associate Dean nor the Dean can be said to have actually exercised professional judgment.

207.     UC's breaches of the contract have caused Plaintiff to be damaged in that Plaintiff was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job and suffered extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, the costs of this action and his attorneys' fees, and (b) an Order requiring University of Chicago to confer Plaintiff with the degree and honors he would have earned but for its wrongful conduct, and (c) such further relied this Court deems just and equitable.

## COUNT III – PROMISSORY ESTOPPEL
### In the Alternative to Count II
### (Against University of Chicago)

208.     Plaintiff realleges paragraphs 198-207 and as if set forth herein.

209.     Plaintiff brings this claim in the alternative to Count II in the event the Court determines that a contract was not made between Plaintiff and UC.

210.     UC made an unambiguous promise to Plaintiff that in disciplinary cases, it would provide Plaintiff with a "fair" and "impartial" resolution and abide by the terms of the Student Manual.

211.     Plaintiff relied upon UC's unambiguous promise by participating in UC's disciplinary proceedings at the direction of Inabinet and in accordance with the Student Manual.

212. Plaintiff's reliance was expected and foreseeable by UC.

213. Plaintiff relied upon UC's promise to its detriment in that the disciplinary process that he participated in at UC's instruction turned out to be neither fair nor impartial as set forth in Count II above.

214. Further, as a direct and proximate result of relying on UC's promise, Plaintiff was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job and suffered extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, the costs of this action and his attorneys' fees, and (b) an Order requiring University of Chicago to confer Plaintiff with the degree and honors he would have earned but for its wrongful conduct, and (c) such further relied this Court deems just and equitable.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against University of Chicago)

215. Plaintiff realleges paragraphs 1-189 as if set forth herein.

216. UC's conduct in wrongfully declaring that Plaintiff committed sexual assault and domestic violence and expelling him from UC days before graduation was extreme and outrageous conduct.

217. UC intended to inflict severe emotional distress on Plaintiff or, at the very least, knew there was a high probability that its conduct would inflict such severe emotional distress.

218. Indeed, the decision was intended to inflict the maximum amount of distress and suffering on Plaintiff as the decision even noted Plaintiff's status as a fourth year on the verge of graduation.

219. Further, given that Plaintiff was about to graduate and would no longer be at UC, expulsion did not serve to further UC's purported "obligation to provide a safe environment while preventing the recurrence of this behavior." It was purely punitive.

220. UC's actions have, in fact, caused Plaintiff to suffer severe emotional distress in the form of extreme anxiety, depression, suicidal ideation and a suicide attempt.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, and (b) such further relief this Court deems just and equitable.

## COUNT V – VIOLATION OF 5th AMENDMENT
### (Against University of Chicago)

221. Plaintiff realleges paragraphs 1-189 as if set forth herein.

222. Although UC is a private university, the protections of the 5th Amendment to the United States Constitution applies when the conduct at issue can fairly be attributed to the federal government.

223. In this case, the Department exercised coercive power over, and provided significant encouragement to UC to adopt procedures that would violate Title IX, Plaintiff's due process rights and Plaintiff's right to basic fairness during UC's disciplinary proceedings.

224. Further, as described in paragraphs 173-189 and 194-195, there is a close nexus between the Department's coercive conduct and UC's gender biased actions and Plaintiff and UC's deprivation of Plaintiff's right to basic fairness.

225. As such, Plaintiff is entitled to the due process protections contained in the 5th Amendment.

226. UC violated Plaintiff's due process protections as more fully set forth in paragraph 205 above.

227. As a direct and proximate result of depriving Plaintiff of his due process protections, Plaintiff was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job and suffered extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, the costs of this action and his attorneys' fees, and (b) an Order requiring University of Chicago to confer Plaintiff with the degree and honors he would have earned but for its wrongful conduct, and (c) such further relied this Court deems just and equitable.

## COUNT VI – 42 U.S.C. 1983 - VIOLATION OF 14TH AMENDMENT
### (Against University of Chicago)

228. Plaintiff realleges paragraphs 1-189 as if set forth herein.

229. Although UC is a private university, the due process protections of the 14th Amendment to the United States Constitution applies when the conduct at issue can fairly be attributed to a state actor. See 42 U.S.C. 1983.

230. In this case, the State of Illinois exercised coercive power over, and provided significant encouragement to UC to adopt procedures that would violate Title IX, Plaintiff's due process rights and Plaintiff's right to basic fairness during UC's disciplinary proceedings.

231.     Further, as described in paragraphs 173-189 and 194-195, there is a close nexus between the State of Illinois' coercive conduct and UC's gender biased actions and Plaintiff and UC's deprivation of Plaintiff's right to basic fairness.

232.     As such, Plaintiff is entitled to the due process protections contained in the 14th Amendment.

233.     UC violated Plaintiff's due process protections as more fully set forth in paragraph 205 above.

234.     As a direct and proximate result of depriving Plaintiff of his due process protections, Plaintiff was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job and suffered extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant University of Chicago in an amount to be proven at trial, including compensatory, general and punitive damages, the costs of this action and his attorneys' fees, and (b) an Order requiring University of Chicago to confer Plaintiff with the degree and honors he would have earned but for its wrongful conduct, and (c) such further relied this Court deems just and equitable.

## COUNT VII – DEFAMATION
### (Against Jane Roe)

235.     Plaintiff realleges paragraphs 1-172 as if set forth herein.

236.     Jane Roe made numerous false statements about Plaintiff, including the following:

    a.   Plaintiff engaged in non-consensual sex with Jane Roe;

    b.   Plaintiff sexually assaulted Jane Roe;

     c.   Plaintiff raped Jane Roe;

     d.   Plaintiff had sex with Jane Roe when she was too drunk to consent;

     e.   Plaintiff had sex with Jane Roe while she was sleeping;

     f.   Plaintiff forced himself inside of Jane Roe; and

     g.   Plaintiff physically abused Jane Roe.

237.    Plaintiff made unprivileged publications of these statements by telling her friends, member of Plaintiff's fraternity, Inabinet, the Committee and *The Chicago Maroon*.

238.    These false statements are defamatory *per se* because they impute that Plaintiff has committed crimes.

239.    These false and defamatory statements have caused Plaintiff damages in that he was erroneously found to have violated the Student Manual – "specifically the sections on domestic violence and sexual assault," expelled from UC, deprived the diploma and degree he rightfully earned, lost his job, suffered extreme emotional distress and inured his reputation in the community.

240.    These false and defamatory statements were made with actual malice and with the intent to injure Plaintiff; they constitute willful and wanton conduct.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant Jane Roe in an amount to be proven at trial, including compensatory, general and punitive damages, and (b) such further relied this Court deems just and equitable.

### COUNT VIII – FALSE LIGHT
### (Against Jane Roe)

241.    Plaintiff realleges paragraphs 1-172 as if set forth herein.

242.     As set forth in paragraph 236, Jane Roe made numerous false statements about Plaintiff to her friends, members of Plaintiff's fraternity, Inabinet, the Committee and *The Chicago Maroon*.

243.     Plaintiff was placed in a false light as a result of Jane Roe's actions. Specifically, Plaintiff was made out to be a sexual predator and violent domestic abuser.

244.     The false light in which Jane Roe placed Plaintiff would be highly offensive to a reasonable person.

245.     Jane Roe acted with actual malice, with knowledge of or reckless disregard for the falsity of the statements she made.

246.     These false statements were made with actual malice and with the intent to injure Plaintiff; they constitute willful and wanton conduct.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant Jane Roe in an amount to be proven at trial, including compensatory, general and punitive damages, and (b) such further relied this Court deems just and equitable.

## COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Jane Roe)

247.     Plaintiff realleges paragraphs 1-172 as if set forth herein.

248.     Jane Roe's conduct in falsely claiming that Plaintiff was a sexual assault and domestic violence perpetrator was extreme and outrageous conduct.

249.     Jane Roe intended to inflict severe emotional distress on Plaintiff or, at the very least, knew there was a high probability that its conduct would inflict such severe emotional distress.

250.     As evidenced by Jane Roe's March 13th texts, she made a deliberate decision to attack and smear Plaintiff with these false statements.

251.    Jane Roe's actions have, in fact, caused Plaintiff to suffer severe emotional distress in the form of extreme anxiety, depression, suicidal ideation and a suicide attempt.

252.    Jane Roe's actions were made with actual malice and with the intent to injure Plaintiff; they constitute willful and wanton conduct.

WHEREFORE, for the foregoing reasons, Plaintiff prays for (a) a judgment in his favor and against Defendant Jane Roe in an amount to be proven at trial, including compensatory, general and punitive damages, and (b) such further relied this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 8, 2018

_____/s/ Sean B. Crotty_____
One of Plaintiff's Attorneys

Sean B. Crotty (ARDC# 6242730)
Eugene J. Schiltz (ARDC# 06181363)
Francis C. Wilkie (ARDC# 6321729)
Crotty & Schiltz, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois  60602
(312) 444-1000
scrotty@crottylaw.com
gschiltz@crottylaw.com
fwilkie@crottylaw.com