# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
|       Plaintiff | ) | |
| v. | ) | Case No. 18-cv-7429 |
| | ) | |
| The University of Chicago and | ) | Judge Virginia M. Kendall |
| Jane Roe, | ) | |
| | ) | |
|       Defendants. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT
## UNIVERSITY OF CHICAGO'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**TABLE OF AUTHORITIES** ..................................................................................**ii**

**INTROCUTION** ................................................................................................**1**

**FACTS** ............................................................................................................**1**

    A.    Roe's claims against Doe ................................................................**1**

        1.    Paragraph 1 (physical abuse) ................................................**1**

        2.    Paragraph 2 (hostile environment) ........................................**4**

        3.    Paragraph 3 (sexual activity ................................................**5**

        4.    Paragraph 4 (the March 9th sexual intercourse) ....................**7**

    B.    Doe's claims against Roe ................................................................**10**

        1.    The Costa Rica incident ....................................................**10**

        2.    The penis incident ............................................................**11**

**ARGUMENT** .................................................................................................**13**

**I.**    **THE COMPLAINT STATES A CAUSE OF ACTION UNDER TITLE IX** .................................................................................**13**

    A.    Erroneous Outcome ......................................................................**14**

    B.    Selective Enforcement ..................................................................**17**

**II.**    **THE COMPLAINT ADEQUATELY ALLEGES A BREACH OF CONTRACT OR, IN THE ALTERNATIVE PROMISSORY ESTOPPEL** ................................**18**

**III.**    **DOE ADEQUATELY ALLEGES FIFTH AND FOURTEENTH AMENDMENT CLAIMS.** ................................................................**20**

**IV.**    **DOE ADEQUATELY PLEADS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.** .................................................................**25**

i

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Brown v. Lynn*,
   385 F.Supp. 986 (N.D. Ill. 1974)............................................................................22

*Brown v. McGarr*,
   583 F.Supp. 734, 736 (N.D. Ill. 1984), *aff'd,* 774 F.2d 777 (7th Cir. 1985)......................23

*Diperna v. Chicago Sch. of Prof'l Psychology*,
   2015 WL 361902, at *3 (N.D. Ill.)..........................................................................19

*Doe v. Baum*,
   903 F.3d 575, 587 (6th Cir. 2018) ...............................................................13, 21

*Doe v. Belmont Univ.*,
   334 F.Supp.3d 877, 890 (M.D. Tenn. 2018)...............................................18, 19

*Doe v. Brandeis Univ.*,
   77 F.Supp.3d 561, 603-607 (D. Mass. 2016) ..................................................... 20

*Doe v. Brown Univ.*,
   327 F.Supp.3d 397, 412-13 (D.R.I. 2018) ..........................................................16

*Doe v. Colgate Univ.*,
   2017 WL 4990629, at *19 (N.D.N.Y.), *aff'd,* 2019 WL 190515 (2d Cir.)....................18, 19

*Doe v. Columbia College Chicago*,
   299 F.Supp.3d 939, 950 (N.D. Ill. 2017)....................................................13,15

*Doe v. Columbia Univ.*,
   831 F.3d 46, 57-58 (2nd Cir. 2016)....................................................15, 16, 17

*Doe v. Lynn Univ.,*
   *Inc.*, 235 F.Supp.3d 1336, 1340-42 (S.D. Fla. 2017).........................................17

*Doe v. Syracuse Univ.*,
   341 F.Supp.3d 125, 138 (N.D.N.Y. 2018) ...............................................15, 17

*Doe v. Univ. of Chicago*,
   2017 WL 4163960 (N.D. Ill.).............................................................................20, 25

*Doe v. Univ. of Notre Dame*,
   2017 WL 1836939, at *9 (N.D. Ind., vacated by consent of the parties,
   2017 WL 7661416 .............................................................................................19, 20

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.,*
    743 F.3d 569, 586 (7th Cir. 2014) ..................................................................16

*Johnson v. Lincoln Christian Coll.,*
    150 Ill.App.3d 733, 739 (1986) ....................................................................18

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,*
    219 F.Supp.2d 20, 42 (D.D.C. 2002) ............................................................ 21

*King v. DePauw Univ.,*
    2014 WL 4197507, at *12 (S.D. Ind.) ...........................................................19

*Liu v. Nw. Univ.,*
    78 F.Supp.3d 839, 848 (N.D. Ill. 2015) ........................................................19

*Martin v. S. Illinois Univ. Sch. of Med.,*
    2017 WL 4780613, at *10 (C.D. Ill.) .............................................................16

*M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.,*
    733 F.2d 973, 983–84 (1st Cir. 1984) .....................................................22, 23

*O'Hara v. Ahlgren, Blumenfeld & Kempster,*
    127 Ill.2d 333, 341 (1989) ...........................................................................18

*Peoria School of Business, Inc. v. Accrediting Council for Continuing Educ. and Training,*
    805 F.Supp. 579, 582 (N.D.Ill. 1992) .......................................................... 22

*Shields v. Illinois Dept. of Corr.,*
    746 F.3d 782, 789 (7th Cir. 2014) ...............................................................21

*Tanner v. Bd. of Trustees of Univ. of Illinois,*
    48 Ill.App.3d 680, 680-81 (1977) .................................................................18

*Tarpley v. Keistler,*
    188 F.3d 788, 791 (7th Cir. 1999) ...............................................................22

*U. S. ex rel. Schonbrun v. Commanding Officer, Armed Forces,*
    403 F.2d 371, 374 (2d Cir. 1968) ................................................................22

*Workman v. Mitchell,*
    502 F.2d 1200, 1205-06 (9th Cir. 1974) ......................................................22

*Xiaolu Peter Yu* v. Vassar Coll.,
    97 F.Supp.3d 448 (S.D.N.Y. 2015) ..............................................................18

*Yusuf v. Vassar Coll.,*
    35 F.3d 709, 715 (2d Cir. 1994) ................................................... 13,14, 16, 17

**<u>Statutory Authorities</u>**

110 ILCS 155/1 *et seq* ..........................................................................................24, 25

## INTRODUCTION

Before we set forth the relevant facts, two explanatory points are in order. First, the facts set forth below are organized around the decisions the University made on Roe's claim against Doe and Doe's claim against Roe. Organizing them this way facilitates consideration of two claims at the heart of Doe's complaint: (1) that the decision against Doe is clearly erroneous, and (2) that the difference in the two decisions is great enough to raise an inference that it is attributable to gender. Second, the University attached the entire record of its proceedings as an exhibit to its brief, and some of our cites are to that document rather than the complaint.

The University's brief describes the timeframe and course of the relationship between Doe and Roe, and we dispense with covering the same ground here. Instead, we proceed directly to the particulars of the two Committee decisions and the flaws in them. To the extent that this statement is argumentative, it should be read as reflecting what the complaint alleges.

## FACTS

### Roe's claims against Doe.

The Committee's decision on Roe's claims is set out in four paragraphs.

## Paragraph 1 (physical abuse)

First, "the Committee concluded there were instances of physical abuse committed by [Doe] during the relationship. These included instances of choking [Roe], spitting on [Roe], and engaging in behavior that caused bruising." Cplt. Ex. B ¶3. The spitting was part of the Costa Rica incident and is covered there. Roe did

accuse Doe of choking her once. University MTD, Ex. 5, p.17.[1] Doe denied having done so. *Id.* p 41. Roe did not say when this supposedly occurred and she did not mention it to anyone, file a report or charges of any kind, or stop dating Doe thereafter.

Roe did accuse Doe of being overly physical at times and bruising her body. Record, p.16. Doe denied causing any bruises and submitted text messages in which Roe good-naturedly acknowledged that bruising was caused by her own clumsiness. *Id.* pp.101-02. The notes of the University's investigator (Mr. Inabinet) say that:

> at one point during the Autumn Quarter, Roe's roommate (witness 18) told her academic advisor about bruises she had seen on Roe. At the time, Roe did not see the bruises as an issue but has since realized there were a lot of things wrong with her relationship with Doe. *Id.* p 4.

In her statement, witness 18 said only that she asked Roe about the bruises "and Roe attributed them to rough sex. Roe did not say much more about it." *Id.* p.70.

Next, the Committee wrote that "throughout the relationship, there seemed to be an increase in the severity of the actions, which culminated in a fight in Costa Rica." Cplt. Ex. B, ¶3. Roe did not claim that there was an "increase in the severity" of Doe's actions and the Committee did not explain what it meant by that or cite any supporting evidence.

The Committee then turned to the incident that took place while Doe was in Costa Rica over the winter holiday with Roe, her mother and brother. In finding Doe guilty based in part on that incident, the Committee described it as follows:

---

[1] Exhibit 5 to the University's Motion to Dismiss is the entire record of the underlying proceeding. Going forward, we cite it as "Record."

2

> [Doe] initiated a fight with [Roe] by slapping her back with shaving cream while [Roe] was in the shower. This resulted in physical contact between [Doe] and [Roe], and ended when [Doe] deliberately spit on [Roe]. Cplt. Ex. B, ¶3.

In finding that Doe "initiated a fight" with Roe by putting shaving cream on her back while she was in the shower, the Committee ignored undisputed evidence that Doe and Roe often engaged in pranks involving physical contact; in Roe's own words, "we liked to mess around with each other, play pranks on each other, and sometimes this would get physical in a mutual and joking way." Record, p.15. Roe herself brought up a previous instance in which Doe put shaving cream on her:

> [Doe] also included a picture of the first time he put shaving cream on me, and [he] said I thought it was funny. This is true, I thought it was really funny – but it was also situational, and I wasn't upset about it because he hadn't hurt me while doing it and did it right before I was about to get in the shower so I could easily wash it off. *Id.* p.92.

Doe and Roe had been arguing in Costa Rica, but Roe did not claim that Doe was trying to "initiate a fight" when he put shaving cream on her back or that he hurt her, even slightly, in doing so; she said only that it was "extremely unnecessary." *Id.* p.21. And, clearly, Doe was only trying to break the tension between them by doing something that Roe had in the past found to be "really funny" (this time when she was already in the shower). Thus, the Committee's finding that Doe was "initiating a fight" with Roe badly mischaracterizes the evidence.

Roe's response to the shaving cream was to punch Doe in the face and grab his arm and dig her fingernails into it hard enough to draw blood. Record, p.36. There is no dispute about these facts, as Doe submitted pictures of his black eye and bleeding arm, *id.,* pp.37-38, and Roe admitted both actions, claiming only that her

3

hit to Doe's face was more a slap than a punch and blaming him for the blood by saying he shouldn't have pulled his arm away while she was digging her fingernails into it. *Id.* p.21. Thus, the Committee blatantly escalated its bias by describing this second part of the incident as "physical contact between [Doe] and [Roe]," a characterization that: (a) avoids attributing responsibility for that contact to Roe; (b) ignores the undisputed fact that Roe acted deliberately; and (c) buries Roe's serious assault in generic language ("physical contact"). The Committee immediately confirmed its bias by describing the third and final aspect of this incident as one in which "[Doe] deliberately spit on [Roe]."

**Paragraph 2 (hostile environment)**

In this paragraph, the Committee

concluded that [Doe] continued to find ways to insert himself into the life of [Roe] for no other reason but to cause her emotional distress [by] intentionally engaging in behavior in front of [Roe] while on a group trip in Cancun for spring break, and attending an Anchor Slam event hosted by [Roe's] sorority. All of these actions were committed after a no-contact directive had been issued by the University. Cplt. Ex. B, ¶4.

The Committee did not have the no-contact directive, so it could not have found that it was violated. And Roe admits that while she and Doe were in Cancun (with many other students) "no direct contact was made." Record, p.27. In addition: (a) when the directive was issued, Doe had made non-refundable down payments for travel and lodging that he would have lost if he had canceled, and (b) several other students who were on the trip said that Doe conspicuously tried to avoid interacting with Roe while they were all in Cancun. *Id.* pp.44, 49 and 75.

4

With respect to the Anchor Slam event, the entire evidence on that matter consisted of a statement by witness 9 and a comment on that statement by Roe. Witness 9's statement is as follows:

> Delta Gamma hosts an event called Anger Slam. The pre-event was held on May 2, 2018. It is very obvious that it is a DG event. Members wear t-shirts and there are signs everywhere. [Doe] showed up at the pre-event. Some of the members of DG asked their sorority president if she could ask [Doe] to leave. The president did go up to [Doe] and asked him to leave and told him he could wait outside while someone got his food and he left. The event was held in the McCormick Lounge in Reynolds Club. [Doe] only went to the pre-event but not to the actual Anger Slam event. Record, p.57, ¶5.

And this is Roe's statement:

> In [witness 9's] statement, an event put on by Delta Gamma "Anger Slam" is mentioned. This event is actually called "Anchor Slam" and is our yearly philanthropy event to raise money for Service for Sight. We had a pre-event to raise awareness for it, and [Doe] attempted to come into it. As soon as he entered McCormick Lounge, my friends saw and ran over to warn me. I had previously told them that every time I see him I freak out, and they wanted to make sure I was okay. I looked over and saw him, and had a small panic attack. My friends had to sit me down in a corner while I stopped crying and got my breath back. They had also asked the president of the sorority to ask him to leave, as he was making me extremely uncomfortable. *Id.,* p.95, ¶1.

**Paragraph 3 (sexual activity)**

In this paragraph, the Committee wrote the following:

> Lastly, [Doe] engaged in non-consensual sexual activity on multiple occasions with [Roe] during the course of their relationship, and on March 9, 2018 after the dating relationship had ended. During the relationship, [Doe] engaged in coercive behavior to get [Roe] to participate in sexual activity after [Roe] clearly expressed a desire not to participate, and [Doe] engaged in sexual activity with [Roe] while she was incapacitated. The coercive behavior included shaming, name calling, and repeatedly asking for sex after being told no. On at least one occasion, [Roe] awoke to [Doe] attempting to penetrate her vagina with his penis. University policy clearly states that a person who is asleep is deemed to be incapacitated and cannot consent to sexual activity; thus this behavior is a direct violation of University policy. Though [Doe] stopped the activity after [Roe] awoke and told [him] to stop,

this is further evidence of [Doe's] lack of consideration for [Roe] during their relationship. Cplt., Ex. B, ¶5.

The March 9 incident is the subject of the entire next paragraph of the Committee's decision, so we temporarily defer addressing it.

With respect to the other issues mentioned in this paragraph, the complaint alleges that the Committee's first and most important finding in this paragraph—that Doe "engaged in non-consensual sexual activity on multiple occasions with Roe during the course of the relationship"—ignores so many of Roe's direct admissions to the contrary that it can only be seen as the product of bias.

In her rebuttal statement Roe acknowledged a number of instances of sexual intercourse between her and Doe after they returned to campus for the winter 2018 quarter (following the Costa Rica incident). Specifically, she admitted that:

● "the time when we were seeing each other [after they got back to campus] started on Wednesday, January 24, 2018 at Bar Night." Roe then tendered text messages with a friend from home in which she admitted that: (a) she "hooked up" with Doe that night; (b) the sex was "good;" (c) going forward "I might just use him for sex when I want it and have no emotional connection;" and (d) she planned to lie to her school friends about all of this because she feared they would not be happy about it. Record, p.87.

● Next, Roe's roommate had a boy over and she accepted Doe's invitation to stay at his apartment so her roommate would have privacy. She texted her friend that she slept on Doe's couch, but admitted that "what I said in these messages is not the truth, and I just didn't want my friends to know what was going on. I did sleep in [Doe's] bed and we had consensual sex." *Id.,* p.88.

● Next, Doe invited Roe over on January 28th when she was starting to feel guilty about lying to her friends. Doe told her to turn off the location finder on her phone so they wouldn't know she was there and she admits that "if we did have sex that night, it would have been consensual." *Id*.

● Next, on February 4th after Doe took Roe to dinner, she says that he pressured her to have sex, which she did not want to do because she had

homework to get to and that "we did have sex, and it was consensual but coerced. I did not sleep over, as I had work to do that night." *Id.*, pp.88-89.

● Next, Roe saw Doe on February 8th before he went to New Orleans for Mardi Gras. She admitted that "assuming we had sex then, it would have been consensual." *Id.,* p.89.

● Roe summarized these events by admitting that Doe was correct in saying she "got what she wanted." While she was upset about what happened in Costa Rica, "in a way, I was just letting him buy me food and was having sex with him to satisfy my own desires, as I knew he would be willing." *Id.*

After February 8th, the relationship between Doe and Roe took a turn for the worse, and she does not claim that they had sex again until March 9th. Roe did, however, voluntarily return to the question of consent at the end of her responsive statement, and made another clear and significant admission:

I will say once again that each time we had sex post-relationship [*i.e.*, after the holiday trip to Costa Rica] was consensual, and the only times of sexual misconduct (in any sense) that I would like to bring attention to happened a few times during our relationship, with the most serious violation occurring on March 9. *Id.* p.98.

She did not say what the incidents other than the one on March 9 were, when they took place, or what Doe did wrong on those occasions. And while the Committee criticized Doe for "name-calling" and "shaming" Roe into sex, it did not criticize Roe for lying to Doe by not telling him that she was just "us[ing] him for sex when I want it and hav[ing] no emotional connection."

**Paragraph 4 (the March 9 sexual intercourse)**

The sexual intercourse between Doe and Roe on March 9 was addressed at great length by both parties. The Committee viewed the sole issue as whether Roe

was sober enough to consent to sex and if not whether Doe should have known that. Cplt., Ex. B, ¶6.

Roe claims that she got very drunk and remembers nothing of the evening, and that it should have been obvious to Doe that she was not sufficiently sober to consent to sex. Record, p.25. Doe does not dispute that he and Roe drank early in the evening but insisted they were both sober when they had sex at 5 o'clock in the morning. *Id.,* p.40.[2] The Committee essentially accepted Roe's statement that since she claims not to remember anything about the sexual activity, she must not have been able to consent and Doe should have known that. In doing so, however, the Committee first ignored Roe's admission that she does indeed have recollections of the evening, at least of things make Doe look bad. For example, in her initial statement, she remembered "trying to stand up and saying 'I want to go home' and [Doe] responding 'you can't leave, I haven't fucked you yet' and pulling me back onto the bed." *Id.* p.24. Then, in her second statement, she recalled that "[Doe] did not offer for me to stay the night—he threw my clothes at me and said 'you should go' at around 6:00 am." *Id.* p.92. Thus, the Committee's acceptance of Roe's claim that she remembers nothing would be dubious even if that was all it had to go on.

But the far bigger problem is that there was a third-party witness who testified directly and at length to the central issue as the Committee framed it. Witness 7, a friend of both Doe and Roe, said the following:

---

[2] The University's brief misstates paragraph 42 of the complaint on a point relevant to this issue, claiming that it alleges that a witness saw Roe "drink a bottle of wine with two other people, shotgun three beers, drink a half a solo cup of whiskey and possibly drink more." University Brf. at 2. In fact, paragraph 42 alleges that this is what *Doe* drank, not what Roe drank.

[Witness 7] was aware that [Roe] and [Doe] broke-up while they were in Costa Rica. [Witness 7] said [Roe] and [Doe] continued to hook-up post the break-up and it seemed to be mutual. [Witness 7] says she was aware of the last time [Roe] and [Doe] hooked-up because [Roe] facetimed her while [Roe] was with [Doe]. On March 9, [witness 7] and [Doe] went to a formal dance together and were at an after party where [Roe] was present. After the party, [Doe] and [Roe] went back to [Doe's] apartment. [Witness 7] said [Roe] was snapchatting videos from [Doe's] apartment while she was there. [Witness 7] said she saw the videos and was told about them by [witness 2], who had also seen them. At around 3 A.M. on March 10, [Roe] facetimed [witness 7] while [Roe] was in [Doe's] bedroom. [Witness 7] was able to see both [Roe] and [Doe] during the facetime and they both had on minimal clothing. The conversation lasted for about an hour, until they said they were disconnecting to go angry fuck. [Witness 7] said by all appearances, everything seemed consensual.

When asked about people's state of mind, related to alcohol consumption from the night of March 9, [witness 7] said everyone had been drinking. [Witness 7] said she had a couple of beers at the formal and was fine. [Doe] seemed fine, too, and [witness 7] was not even sure if [Doe] could get drunk. [Witness 7] said it was hard for her to tell when guys are drunk. [Witness 7] did not see [Roe] drink any, and said she did not seem to be extremely drunk. [Witness 7] said she has seen [Roe] blackout drunk and she did not seem that way. *Id.,* p.55.

This statement completely corroborates Doe's version on all the important details of that evening and is highly credible, as witness 7 was a friend of both Doe and Roe, knew about their relationship, knew how they acted when they had been drinking, and had been with them both earlier in the evening. Also, because she was on a Facetime call in which Doe and Roe told her they were about to have sex (and were in bed with most of their clothes off), witness 7 was directly attuned to the issue of consent. And because the call lasted an hour and was a Facetime call in which she could both see and talk to Doe and Roe, witness 7 clearly had a sound basis for judging Roe's ability to consent. Finally, her opinion on that issue was not vague or qualified. She said that "by all appearances, everything seemed consensual."

9

And that is not the only independent evidence the Committee ignored. Two other students also addressed that evening. Witness 2 said the following:

> That night of the party [March 9] was only the second time [witness 2] had hung out with [Doe] or [Roe]. To [witness 2] it seemed that [Roe] and [Doe] were very cordial to one another and on good terms for being ex's. They both equally seemed to want to spend the night together that night. *Id.,* p.48.

And witness 19 said this:

> [Witness 19] was also at a house party (the Cove party) the night the incident happened between [Doe] and [Roe]. He stated that [Roe] was reasonably drunk. She was perfectly functional, not slurring words, but it was clear she had a bit to drink. By knowing [Roe], he was able to pick up on her behavior and could tell she had had a bit to drink. That was around 10:30 PM or 11 PM. [Roe] did not speak to [Doe] at the party. About an hour or two later, [witness 18] told [witness 19] that [Doe] and [Roe] had left together. *Id.,* p.72.

The Committee ignored all of the independent third-party testimony supporting Doe's version of what happened on March 9 and simply accepted Roe's version.

### Doe's claims against Roe

Doe's claims against Roe centered on two incidents.

## The Costa Rica incident

Doe complained about the Costa Rica incident in which Roe punched (or slapped) him in the face hard enough to give him a black eye, then scratched his arm hard enough to draw blood. The Committee rejected this claim because:

> the physical response of [Roe] was a direct reaction to physical behavior initiated by [Doe] and was an isolated event during the course of the relationship. Cplt., Ex. C, ¶3.

Regarding the first point, the Committee used the fact that Doe spit on Roe against him even though it was also "a direct reaction to physical behavior initiated by Roe." Moreover, Roe was reacting to a prank of Doe's that she had previously found to be

"really funny" while Doe was reacting to a serious assault. Thus, the finding that Roe's conduct was a defensible "reaction" but Doe's was not is patent bias.

The Committee's comment that Roe's assault was excusable because it was an "isolated event" is just as troubling. Does the University have a "one-punch" rule that allows its students one free punch to the face of another student? And if it does, why is Doe not excused from the single instance in which he spit on Roe?

The Committee went on to say that Roe's actions "came at the end of the relationship with [Doe] where [Roe] had been physically and emotionally abused by [Doe]." This statement is wrong as, by Roe's own admission, she and Doe had sexual intercourse many times after they returned to campus in January, each of which (except for March 9) she admits were consensual. But even if the statement was true, why does the timing of the Costa Rica incident matter for Doe but not Roe?

The Committee concluded its disposition of this part of Doe's claim by saying that "this fight seemed to be the culmination of events between [Roe] and [Doe]." That statement isn't true and the Committee did not explain why it was a basis on which to reject Doe's claim.


**The penis incident**

The Committee also exhibited bias in disposing of the second incident complained of by Doe:

> I had sustained an injury during sex and had a cut on my foreskin. It was incredibly painful and I could not have sex for about a week. When I told [Roe] this she wanted me to show her. I didn't feel comfortable showing her and I was embarrassed but she kept trying to pull my pants down to see. At

11

first, I treated it as a game and she chased me around the apartment. After about 5 minutes I told her very seriously to stop yet she persisted for another 10 minutes. She said she would stop but after a little while she would try to pull my pants down when I wasn't on guard. Eventually I gave up and showed her because she would not stop no matter what. I was bothered by this but decided to let it go because I liked her so much and things were going so well. Record, p.100.

Roe does not dispute any of these facts, except to claim: (a) that she wanted to see Doe's penis because she feared he had contracted a sexually-transmitted disease; and (b) that she never did see it. *Id.*, p.97. Thus, Roe conceded that the incident took place, and Doe's version of its key aspects is unrebutted.

Faced with this evidence, the Committee wrote that it had:

received conflicting, but similar versions of the event from [Roe] and [Doe]. In evaluating the information received, the Committee unanimously concluded that the behavior described in both scenarios would not rise to the level of a policy violation. Though [Roe] did ask to see [Doe's] penis, the request did not cross the threshold of being severe or pervasive, and according to [Roe], [Doe] thought the actions of [Roe] were cute. Cplt., Ex. C, ¶4.

The Committee did not explain why it found that Roe's conduct was not severe or pervasive in light of the undisputed facts that Roe: (a) did not just ask to see Doe's penis, she chased him around trying to pull down his pants; (b) she continued doing that after Doe asked her "very seriously" to stop; and (c) when Roe was not initially successful in pulling down Doe's pants, she waited a while, then tried to sneak up on him and pull them down when he wasn't paying attention. Moreover, the Committee criticized Doe for "engag[ing] in coercive behavior to get [Roe] to participate in sexual activity after [Roe] clearly expressed a desire not to participate," while excusing Roe's extensive efforts to pull down Doe's pants even after he clearly and seriously asked her not to do so.

12

Finally, the last word of the Committee's decision on this issue is telling. Doe did not say that Roe's conduct was "cute." Just the opposite. Nor did Roe claim in her statement that Doe found her conduct "cute." That word came from the pen of Mr. Inabinet, who wrote the following in his initial summary:

> As to the reported incident with [Doe's] penis, [Roe] said she did not want to invalidate Doe's thoughts and feelings about the incident. [Roe] said that the incident was more situational and that [Doe] said he had bumps on his penis. [Roe] wanted to see it because she was more concerned by what it could have been. [Roe] said she has not thought about the incident since it happened and at the time, [Doe] told her he thought what she was doing was cute. Record, p.7.

It is one thing to choose between two conflicting versions of an event, but something entirely different to do what the Committee did here: ignore essentially undisputed testimony and credit instead its investigator's personal assessment of the evidence.

## ARGUMENT

### I.     The complaint states a cause of action under Title IX.

Doe alleges two theories of recovery under Title IX: erroneous outcome and selective enforcement. To plead the former, he must allege: (1) facts sufficient to cast doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a connection between the flawed outcome and gender bias. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). To plead the latter, he must allege "that, regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by [his] gender." *Id. See also, Doe v. Columbia College Chicago*, 299 F.Supp.3d 939, 950 (N.D. Ill. 2017). In making these assessments, the Court must keep in mind that "Doe's allegations do not have to give rise to the *most*

plausible explanation—they just have to give rise to one of them." *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018) (emphasis in original).

### A)    Erroneous Outcome

The burden of pleading enough facts to cast doubt on the accuracy of the outcome of a disciplinary proceeding "is not heavy," and may focus on substantive or procedural shortcomings. *Yusuf, supra,* 35 F.3d at 716. In this case, there are both.

Substantively, there are more than enough facts to call the outcome into question. Specifically, the Committee:

- aggressively slanted the facts in favor of Roe and against Doe with respect to the Costa Rica incident that was raised by both parties;

- ignored the third-party testimony, all of which supported Doe, with respect to the March 9th encounter that was central to Roe's claim;

- accepted Roe's statement that she remembered nothing about the events of March 9th despite her contradictory statement that she remembers the parts of the evening that make Doe look bad;

- decided that Roe was too drunk to consent to sex on March 9th but did not even consider whether Doe was also too drunk to consent even though it is undisputed that both of them had been drinking;

- found that Doe pressured Roe into non-consensual sex even though Roe repeatedly conceded that (other than on March 9th) the sex was consensual;

- rejected Doe's complaint about the penis incident by ignoring the undisputed facts and adopting instead the personal assessment of the University's investigator (Mr. Inabinet);

- criticized Doe for violating a no-contact directive that it did not have and insinuated that he violated that directive by "inserting himself into Roe's life" in two instances where he clearly did not do so;

- criticized Doe for "name-calling" and "shaming" Roe into sex, but ignored the fact that Roe lied to Doe by not telling him that she was "us[ing] him for sex when I want it and hav[ing] no emotional connection;" and

- made several comments about the relationship between Doe and Roe that were either indisputably wrong or irrelevant to the issues.

These are precisely the kinds of things that can be used to show that an outcome was erroneous. *See, e.g., Doe v. Columbia Univ.*, 831 F.3d 46, 57-58 (2nd Cir. 2016) (holding that "[w]hen the evidence substantially favors one party's version of a disputed matter but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias," and that bias can be tied to the involvement of an school administrator who, while not a decision-maker, had significant influence); *Doe v. Columbia College Chicago*, 299 F.Supp.3d 939, 954-55 (N.D. Ill. 2017) (finding of sexual assault can plausibly be found erroneous based on "students' affidavits indicating that Roe did not appear incapacitated, Roe's amicable text messages to Doe the next morning, and Doe's own testimony that Roe consented to their interaction."); *Doe v. Syracuse Univ.*, 341 F.Supp.3d 125, 138 (N.D.N.Y. 2018) (University ignored that "Roe appeared to utilize the disciplinary process as a means to punish Doe by alleging that he violated the No Contact Order [and that] the investigation revealed that both Doe and Roe were highly intoxicated but applied the presumption of the inability to knowingly consent to sexual intercourse only to Roe;" "failed to examine many of the blatant contradictions in Jane Roe's statements;" and "chose to believe Roe's description of events in Doe's room even though Roe indicated that she had very little memory of the Incident.").

Procedurally, the complaint alleges that Doe was denied a large number of standard procedural safeguards designed to ensure the fairness of the proceedings and that this contributed to the erroneous outcome. Cplt., ¶205.

The second element of an erroneous outcome claim is connecting that outcome to a bias attributable to gender. *Yusuf,* 35 F.3d at 715. The *McDonnell Douglas* framework applies to allegations of gender bias under Title IX. *Martin v. S. Illinois Univ. Sch. of Med.*, 2017 WL 4780613, at *10 (C.D. Ill.); *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 586 (7th Cir. 2014) (Manion opinion); *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). In this case, an inference of bias can be drawn from two distinct sources.

First, it can be based on the fact that Doe was treated differently from a similarly situated member of the opposite sex (Roe). *Doe v. Brown Univ.*, 327 F.Supp.3d 397, 412-13 (D.R.I. 2018). There is considerable evidence that the University aggressively slanted its decisions on the competing claims that Doe and Roe made against one another strongly in favor of the female student

Second, the complaint alleges that the University harbored a pro-female bias as a result of intense criticism it faced from the federal government and the local community for turning a blind eye to sexual assault claims made by female students against male students. This pressure was a direct result of a gender discrimination complaint filed with the U.S. Department of Education by a female student alleging that the University's sexual assault policies discriminated against women. This complaint triggered public criticism in numerous newspaper articles and a federal

16

investigation. In addition, the Department of Education sent the University a "Dear Colleague" letter, pressuring it to adopt new sexual assault guidelines or risk losing millions of dollars in federal funding. Cplt., ¶¶173-89.

This bias is not based on a conclusory allegation that the "Dear Colleague" letter alone induced the University to discriminate against males in sexual-assault investigations in order to preserve federal funding. Rather, Doe alleges specific community and government pressure of the kind that has been found sufficient to support an inference of gender bias. *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016) (bias can be inferred from fact that, prior to disciplinary hearing, "there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students."); *Doe v. Syracuse Univ.*, 341 F.Supp.3d 125, 138–39 (N.D.N.Y. 2018) (allowing inference of bias when, in addition to the "Dear Colleague" letter, the university faced a federal investigation into its sexual assault policies); *Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336, 1340-42 (S.D. Fla. 2017) (allowing inference of bias when, on top of the "Dear Colleague" letter, public media reports had attacked university's handling of sexual assault claims).

### B)   Selective Enforcement

A selective enforcement claim asserts that regardless of the student's guilt or innocence, the severity of the penalty or the decision to initiate the proceeding was affected by the student's gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). "To support a claim of selective enforcement, a male plaintiff must

demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Xiaolu Peter Yu*, 97 F.Supp.3d 448, 480 (S.D.N.Y. 2015). What was said above with respect to the erroneous outcome claim is sufficient to demonstrate that the selective enforcement claim is also adequately pled here. Doe was expelled from the university on the eve of his graduation, while Roe received no punishment at all.

## II.    The complaint adequately alleges a breach of contract or, in the alternative, promissory estoppel.

In Illinois, a contract exists between a university and its students, the terms of which are set forth in the school's catalogs and manuals. *Johnson v. Lincoln Christian Coll.*, 150 Ill.App.3d 733, 739 (1986). As part of this contract a university "may not act maliciously or in bad faith by arbitrarily and capriciously refusing to award a degree to a student who fulfills its degree requirements." *Tanner v. Bd. of Trustees of Univ. of Illinois*, 48 Ill.App.3d 680, 680-81 (1977). The University argues that a disclaimer in its student handbook eliminates its contractual obligations, but reading the disclaimer that broadly would render it unenforceable. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill.2d 333, 341 (1989). Because Illinois law establishes a contractual relationship between a university and its students, any attempt to disclaim that relationship is unenforceable. *Doe v. Belmont Univ.*, 334 F.Supp.3d 877, 890 (M.D. Tenn. 2018); *Doe v. Colgate Univ.*, 2017 WL 4990629, at *19 (N.D.N.Y.), *aff'd,* 2019 WL 190515 (2d Cir.). And even if the disclaimer could bar the student manual from being read as a written contract, it would not prevent the Court from using it to determine the terms of the implied contract between the

University and its students. *Id.* Here, the complaint contains many allegations demonstrating that the University acted in bad faith by withholding Doe's degree.

First, the University's failure to afford Doe the procedural protections in the student manual is arbitrary and capricious conduct. *Liu v. Nw. Univ.*, 78 F.Supp.3d 839, 848 (N.D. Ill. 2015). Second, the University's disparate treatment of the claims made by Doe and Roe is also evidence of arbitrary and capricious conduct. *Diperna v. Chicago Sch. of Prof'l Psychology*, 2015 WL 361902, at *3 (N.D. Ill.).

Third, the University's failure to apply its own definition of consent is arbitrary conduct. *King v. DePauw Univ.*, 2014 WL 4197507, at *12 (S.D. Ind.). In this case, the university's definition of consent requires it to evaluate whether a reasonable third party would have known an individual was too incapacitated to consent. Cplt., ¶143. The University completely ignored the unconverted evidence of three neutral third party witnesses and based its decision entirely on Roe's contradictory, subjective statement that (with selective exceptions) she did not remember what happened on March 9th and so could not have consented to sex.

Fourth, the University's failure to provide Doe with specific information about the alleged conduct of his that it was investigating or the specific violations with which he was being charged is evidence that it what acting arbitrarily and capriciously. *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *9 (N.D. Ind., vacated by consent of the parties, 2017 WL 7661416.

Fifth, the University's use of inconsequential character evidence as well as its failure to properly investigate Roe's bias and credibility violated a specific

contractual promise that character evidence would not be considered. Instead, the material submitted to the Committee was rife with character evidence that painted Doe in an unflattering light. Additionally, a member of the hearing panel who had dated Doe's friends and had a pre-hearing bias against him directed him to address his sexual history with another student even though such evidence is expressly barred. Cplt., ¶¶97, 104; University MTD, Ex. 2, p.119, ¶1.[3]

Sixth, the University failed to consider evidence of Roe's ulterior motive for making accusations against Doe, specifically, the possibility that those accusations were an outgrowth of her (admitted) lying to her friends about her post-Costa Rica sexual relationship with Doe. *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at \*10.

Finally, the University's failure to provide basic procedural due process violated its promise to conduct a fair hearing. Specifically, Doe inability to have counsel, confront his accuser, call or cross-examine witnesses, and the use of the preponderance of evidence standard, combined to deny him a fair hearing. *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 603-607 (D. Mass. 2016). Accordingly, more than enough facts are alleged to support the allegation that the University's withholding of Doe's degree was a breach of contract.[4]

## III. Doe adequately alleges Fifth and Fourteenth Amendment claims.

---

[3] Exhibit 2 to the University's motion to dismiss is its entire 2017-2018 Student Manual.

[4] Doe pleads an alternative claim for promissory estoppel if the Court concludes that there is no contract. This count is based on the assertion that the university unambiguously promised Doe that it would abide by the procedures in the student manual in its investigation. This unambiguous promise differentiates this case from *Doe v. Univ. of Chicago*, 2017 WL 4163960 (N.D. Ill.).

The University seeks to dismiss Doe's Fifth and Fourteenth Amendment claims on two grounds. First, it argues that "corporate entities like the University are generally exempt from liability under section 1983 and the Fifth Amendment." Second, it argues that Doe does not have a valid basis for his claims because "the University is a private entity, not an arm of the state or federal government." (University Brf. at 11). Neither argument has merit.

A corporate entity acting under the color of state law is directly liable under the Fourteenth Amendment (pursuant to 42 U.S.C. §1983) for injuries caused by its unconstitutional policy, customs or practices. *Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Doe's injuries here are a direct outgrowth of the University's policies, customs and practices that denied him his due process rights. Prohibiting him from cross-examining his accuser or talking to and then calling witnesses to testify were clear due process violations, particularly since the University's decision rested largely on a credibility determination. *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018).

With respect to the Fifth Amendment claim, the *Malesko* decision cited by the University does not entirely insulate it from liability. This Court has the power to grant Doe his degree under the Mandamus and Venue Act, 28 U.S.C. §§ 1361, 1391, which provides an avenue for relief when a law creating a duty (here the Fifth Amendment) does not otherwise permit a private right of action. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F.Supp.2d 20, 42 (D.D.C. 2002). A mandamus action allows a court to remedy constitutional violations of government

actors that are a result of a clear abuse of discretion. *U. S. ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371, 374 (2d Cir. 1968); *Brown v. Lynn*, 385 F.Supp. 986 (N.D. Ill. 1974). This power includes compelling compliance with the requirements of due process, notwithstanding the fact that the precise elements of the duties required have not been prescribed *Workman v. Mitchell*, 502 F.2d 1200, 1205-06 (9th Cir. 1974).

With respect to the University's second argument, Doe alleges that its actions during his disciplinary review were fairly attributable to the state or federal government, entitling him to the due process protections provided for in the Fifth and Fourteenth Amendments. The determination of when a private party acts under color of state or federal law is inherently difficult and requires a fact-based inquiry. *Tarpley v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999). Courts attribute the action of a private actor to the government if there is a "sufficiently close nexus between the [government] and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [government] itself." *Peoria School of Business, Inc. v. Accrediting Council for Continuing Educ. and Training*, 805 F.Supp. 579, 582 (N.D.Ill. 1992). The nexus exists when: (1) the government either coerced the University's actions or offered such encouragement for those actions that it is responsible for them, or (2) the University exercises powers that are traditionally the exclusive prerogative of government. *Id.* The exclusive prerogative of the government includes acting in a judicial or quasi-judicial function. *M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973,

983–84 (1st Cir. 1984) (because quasi-judicial powers are normally a public function, "where private groups are permitted to exercise such public powers, they may be required to afford fair and appropriate procedures."); *Brown v. McGarr*, 583 F.Supp. 734, 736 (N.D. Ill. 1984), *aff'd,* 774 F.2d 777 (7th Cir. 1985) ("When an individual's rights are being determined in a judicial or quasi-judicial proceeding, due process requires that the individual be given notice and afforded an opportunity to be heard.").

The complaint alleges that the federal government, through the Department of Education, coerced the University to adopt the specific policies and procedures set forth in the 2011 Letter and 2014 Guidance by threatening to cut off federal funding for universities that did not comply. Cplt., ¶¶174-82. These procedures included lowering of the burden of proof, denying the right to cross examination, minimizing fact finding, and emphasizing speed of resolution over basic due process rights. *Id.*, ¶180. Indeed, affording an accused due process rights would be treated as evidence of a hostile environment. *Id.*, ¶182. The complaint then alleges that the University adopted policies lowering the burden of proof, stripping away the right of cross examination, and denying an accused the right to even talk to witnesses who might support a defense, in direct response to the Department's coercive threats to deprive it of federal funding. *Id.*, ¶185.

Finally, the complaint alleges that the federal government has admitted that its coercive tactics resulted in schools establishing "procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are

overwhelmingly stacked against the accused, and are in no way required by Title IX or regulation …'" *Id.*, ¶187. And it further admitted that its prior actions "led to the deprivation of rights for many students." *Id.*, ¶188. Given the federal government's admission that it coerced universities into adopting policies that deprived students of basic due process, Doe's Fifth Amendment claim is clearly plausible.

With respect to the Fourteenth Amendment, the Complaint alleges that the state government, through its Preventing Sexual Violence in Higher Education Act, gave the University's disciplinary committee a quasi-judicial function and that it was coerced into adopting the specific policies and procedures it used to wrongfully find against Doe. Cplt., ¶¶183-86.

PSVHEA mandates that an accused student participate in a complaint resolution process. 110 ILCS 155/25. And by providing that the accused can only refuse to testify in the presence of the other party, PSVHEA tacitly grants a university the power to compel his testimony. 110 ILCS 155/25(b)(12). PSVHEA then bars universities from granting students due process rights during the mandated complaint resolution process by dictating the evidentiary standards and applicable legal definitions, and barring procedural due process rights such as the right to cross-examination. 110 ILCS 155/25(b)(5),(10); 110 ILCS 155/10(1). The cumulative effect of these mandates is that PSVHEA has conferred on universities quasi-judicial powers to determine students' rights.

PSVHEA also coerces universities into convicting students accused of sexual assault absent proof of their wrongdoing. It repeatedly uses the term "survivor" to

refer to the accuser in the regulations it directs universities to use. In so doing, PSVHEA coerces universities to adopt policies and procedures that presuppose the truth of sexual assault allegations. Those policies manifested themselves in the way the University handled Doe's hearing and the comments from university officials such as Mr. Inabinet that the burden is on the accused.

Thus, the complaint sufficiently alleges that the University's actions were coerced by the state of Illinois to support a claim under the Fourteenth Amendment.

## IV. Doe adequately pleads intentional infliction of emotional distress.

A claim for intentional infliction of emotion distress requires allegations that: (1) the defendant's conduct was "extreme and outrageous;" (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress. *Doe v. Univ. of Chicago*, 2017 WL 4163960, at *11 (N.D. Ill.). The University expelled Doe days before graduation even though it knew that Roe's allegations were false and that there was "a high probability that being pursued by a false sexual-assault complaint would cause John Doe severe emotional distress." *Id.* at *12.

Dated: February 15, 2019      Respectfully submitted,

/s/ Sean B. Crotty
One of Plaintiff's Attorneys

Sean B. Crotty (ARDC# 6242730)
Eugene J. Schiltz (ARDC# 06181363)
Francis C. Wilkie (ARDC# 6321729)
Crotty & Schiltz, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois  60602
(312) 444-1000
scrotty@crottylaw.com
gschiltz@crottylaw.com
fwilkie@crottylaw.com

## CERTIFICATE OF FILING

I, Sean B. Crotty, an attorney, hereby certify that on February 15, 2019, I caused the foregoing **Plaintiff's Brief in Opposition to Defendant University of Chicago's Motion to Dismiss** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system.

/s/ Sean B. Crotty